

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-2-1998

# Trump Hotel & Casino v. Mirage Resorts Inc

Precedential or Non-Precedential:

Docket 97-5281

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Trump Hotel & Casino v. Mirage Resorts Inc" (1998). *1998 Decisions.* Paper 68.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/68

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 2, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-5281

TRUMP HOTELS & CASINO RESORTS, INC.,

        Appellant

v.

MIRAGE RESORTS INCORPORATED; THE STATE OF
NEW JERSEY; THE NEW JERSEY DEPARTMENT OF
TRANSPORTATION; THE SOUTH JERSEY
TRANSPORTATION AUTHORITY; THE CASINO
REINVESTMENT DEVELOPMENT AUTHORITY; THE NEW
JERSEY TRANSPORTATION TRUST FUND AUTHORITY;
JOHN J. HALEY, JR., in his capacity as Acting
Commissioner of the New Jersey Department of
Transportation; JAMES A. CRAWFORD, in his capacity as
Executive Director of the South Jersey Transportation
Authority; JAMES B. KENNEDY, in his capacity as
Executive Director of the Casino Reinvestment
Development Authority; STEVEN HANSEN, in his capacity
as Executive Director of the New Jersey Transportation
Trust Fund Authority

On Appeal from the United States District Court
for the District of New Jersey
Civil Action No. 97-cv-01371

Argued: February 11, 1998

Before: GREENBERG, NYGAARD and McKEE,
Circuit Judges

(Opinion Filed: April 2, 1998)

HERBERT J. STERN, ESQ. (Argued)
Stern & Greenberg
75 Livingston Avenue
Roseland, New Jersey 07068
Attorneys for Appellant

PETER VERNIERO, ESQ.
JEFFREY J. MILLER, ESQ.
Office of Attorney General of
New Jersey
Division of Law
Richard J. Hughes Justice Complex
CN 112
Trenton, New Jersey 08625
Attorney for Appellees, The State of
New Jersey, The New Jersey
Department of Transportation, The
New Jersey Transportation Trust
Fund Authority, John H. Haley, Jr.,
and Steven Hansen

GUY P. RYAN, ESQ.
MARC D. HAEFNER, ESQ.
 (On the Brief)
Gilmore & Monahan
10 Allen Street
Box 1540
Toms River, New Jersey 08754
Attorney for Appellees, The South
Jersey Transportation Authority and
James A. Crawford

KEVIN J. COAKLEY, ESQ. (Argued)
Connell, Foley & Geiser LLP
85 Livingston Avenue
Roseland, New Jersey 07068
    and

2

MICHAEL R. COLE, ESQ.
Riker, Danzig, Scherer, Hyland &
Perretti LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962
Attorneys for Appellees, the Casino
Reinvestment Development Authority
and James B. Kennedy

OPINION OF THE COURT

McKEE, Circuit Judge:

Trump Hotels & Casino Resorts, Inc., appeals from the district court's Rule 12(b)(6) dismissal of this action which Trump brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. S 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. S 240.10b-5. Trump also appeals the district court's subsequent refusal to exercise supplemental jurisdiction over state law claims. For the reasons that follow we agree with the district court's conclusion that Trump lacks standing, and we will therefore affirm.

I.

Mirage Resorts, Inc., and Trump Hotels and Casino Resorts, Inc. own competing casinos in Atlantic City, New Jersey. Although Trump brought this action under the securities laws, the seeds of this dispute were sown when a real estate development was planned in Atlantic City. Although our inquiry does not need to address the details of the planned development, a brief discussion of it is necessary to place the dispute in context.

The action arises from a dispute involving the redevelopment of a parcel of land known as the Huron North Redevelopment Area ("H-Tract"). The H-Tract is located in the Marina District of Atlantic City and is comprised of approximately 178 acres, 150 of which are owned by Atlantic City. The tract consists of wetlands that

were used as a municipal landfill until the 1960's. Trump claims that the H-Tract is highly contaminated with hazardous substances and is vacant except for a few municipally maintained facilities.

In November of 1994, the City Council of Atlantic City authorized the City Planning Board to prepare a Redevelopment Plan for the H-Tract. On April 12, 1995, the City Council of Atlantic City adopted the Redevelopment Plan proposed by the Planning Board and began seeking a developer for the H-Tract pursuant to that Redevelopment Plan. Mirage emerged as a potential developer and proposed to build a casino complex on the H-Tract. Thereafter, Mirage entered into a series of agreements with the City (including a Redevelopment Agreement, and a Memorandum of Understanding) regarding the proposed development of the H-Tract as a multi-casino resort. The Redevelopment Agreement gave Mirage an option to acquire and develop the H-Tract as a multi-casino resort in exchange for Mirage's undertaking to remediate environmental contamination and to pay for the relocation of the City's existing facilities on the site.

Shortly before the execution of the Memorandum of Understanding between Mirage and the City, the Atlantic City delegation to the New Jersey State Legislature introduced legislation known as the Municipal Landfill Site Remediation & Redevelopment Act, N.J.S.A. 13:1E-116.1 – 116.7 (the "Remediation Act"). The Remediation Act was subsequently enacted into law. According to Mirage, the Remediation Act allows Mirage to be reimbursed for the majority of the closure and remediation costs associated with its clean-up of the H-Tract.1

The Redevelopment Agreement conditioned Mirage's obligations to develop the H-Tract upon a number of

_____

1. The Remediation Act "permits a developer who closes and remediates an eligible site the opportunity to apply for reimbursement of up to 75 percent of the costs after commencement of a business operation on the remediated site. The State makes the reimbursement from a fund comprised of one-half of all state sales taxes collected from the business on that site." State of New Jersey and The Casino Reinvestment Development Authority v. Trump Hotels & Casino Resorts, No. ATL-L-1373-97, slip opn. at 8-9 (N.J. Law Div., May 14, 1997).

contingencies. The most significant contingency for purposes of this dispute was the approval and funding by the State of New Jersey of a roadway called the"Westside Connector." The plans for the Westside Connector include the construction of a 2.2 mile long highway connecting the Atlantic City Expressway to Brigantine Boulevard, and a 2,000 foot long tunnel. Trump claims that construction of the tunnel portion of the Westside Connector requires the acquisition and destruction of nine private homes and more than 200 units of federally-assisted low income housing, 47 of which are currently occupied. Trump also claims that the Westside Connector will provide direct access to the H-Tract, that its primary purpose is to facilitate the development of the H-Tract by Mirage, and that Mirage will not proceed with the development of the H-Tract in the absence of the Westside Connector.

On September 17, 1996, the New Jersey Department of Transportation ("DOT") and Mirage entered into a Memorandum of Understanding regarding the design and construction of the Westside Connector. The Memorandum of Understanding was followed by the execution of a Road Development Agreement between Mirage, the State of New Jersey, acting through the DOT, and the South Jersey Transportation Authority ("SJTA").

The Road Development Agreement reflects a commitment by the parties to move forward with the proposed Westside Connector, and it defines the respective obligations of the parties regarding the proposed construction and details various conditions to the closing of the Road Agreement. It also sets forth the funding sources for the project, which include $65 million in proceeds from bonds issued through the South Jersey Transportation Authority ("SJTA") repayable from, and collateralized by, parking and investment funds collected for use by the Casino Reinvestment Development Authority ("CRDA") and $55 million in the proceeds of bonds issued through the SJTA repayable from, and collateralized by, alternative investment tax obligations of all casinos that will be located on the H-Tract.

Trump currently owns three of the thirteen casinos in Atlantic City. One of Trump's casinos, "Trump's Castle," is

located in the Marina District near the H-Tract. Trump claims that it will be adversely affected by the construction of the Westside Connector and the development of the H-Tract in a number of ways. The Westside Connector will significantly reduce access to Trump's Castle. During construction it will effectively block access to Trump's Castle for a year or more, and make it difficult for persons from within and without the City to get to Trump Hotels' Atlantic City casinos. Trump claims that its business will thus be seriously injured. In addition, Trump claims that the new road will increase traffic flow into the city and therefore worsen local air quality conditions and traffic congestion which already adversely affect Trump's patrons and employees. Trump also alleges that the development will endanger the community because the H-Tract is highly contaminated. Trump alleges that since the Westside Connector will bisect the city, the H-Tract development will cause permanent injury to the City's entire Boardwalk area, including Trump's Taj Mahal and Palace casinos, into which Trump has invested enormous amounts of money.

On March 14, 1997, Trump filed a complaint against Mirage, the State of New Jersey, the New Jersey DOT, the SJTA, the CRDA and the New Jersey Transportation Trust Fund in the United States District Court for the District of New Jersey. Trump sought declaratory and injunctive relief which would effectively bar the construction of the Westside Connector and the development of the H-Tract by halting the sale of the bonds that are a necessary component of the funding scheme. Trump alleged that the funding scheme for the planned construction of the Westside Connector and the development of the H-Tract would violate numerous statutes,2 state law3 and the New Jersey Constitution.

_____

2. In addition to an allegation of impending securities fraud, Trump's complaint also alleged violations of the following federal statutes: Section 404 of the Clear Water Act, 33 U.S.C. S 1344; the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. S 403; the Federal-Aid Highway Act, 23 U.S.C. S 109 and the Clean Air Act, 42 U.S.C. S 7506. The district court granted defendants' 12(b)(6) motion as to those claims and Trump has not appealed from the dismissal of those claims. The district court dismissed the Clean Water Act because Trump failed to comply with the act's notice requirement; dismissed the Rivers and Harbors Act claim

6

However, we are only concerned with Trump's allegations that the funding mechanism violates the Securities and Exchange Act of 1934, 15 U.S.C. S 78j(b), Securities and Exchange Commission Rule 10b-5, 17 C.F.R. S 240.10b-5, and Article IV, S 7, P 2 of the New Jersey Constitution.

The defendants initially moved to dismiss Trump's complaint under Fed. R. Civ. P. 12(b)(6) alleging that the complaint failed to state a claim. Simultaneously, they filed a complaint in the Law Division of the Superior Court of New Jersey naming Trump as a defendant and seeking a declaration that the statutory provisions which allowed for CRDA funding of various projects were constitutional.4 State of New Jersey and the Casino Reinvestment Development Authority v. Trump Hotels and Casino Resorts, Inc., No. ATL-L-1373-97 ("State litigation").

On May 1, 1997, the district court dismissed all of the federal claims under Fed. R. Civ. P. 12(b)(6) and declined to exercise supplemental jurisdiction over the state law claims. Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 963 F.Supp. 395 (D.N.J. 1997). This appeal followed. However, Trump only appeals from the district court's dismissal of its 10b-5 claim and the refusal to exercise supplemental jurisdiction over the New Jersey constitutional claim. The district court held that Trump had no standing to seek injunctive relief under Rule 10b-5 because the claimed injury was too indirect and remote

_____

because the Act provides no private cause of action; dismissed the Federal-Aid Highway Act claim because Trump's complaint admitted that no federal funds would be used to fund the project; and dismissed the Clean Air Act claim because Trump failed to allege federal funding and failed to plead compliance with the statute's notice requirement.

3. The complaint also alleged a violation of the New Jersey Coastal Area Facility Review Act, N.J.S.A. SS 13:19-1, et seq. The district court declined to exercise supplemental jurisdiction over that state law claim and Trump has not appealed from that decision.

4. The defendants believed that Trump's federal litigation created a cloud that had to be removed before the CRDA could issue the bonds. Appellees' Br. at 6. They also believed that the federal court did not have subject matter jurisdiction over the state constitutional question raised by Trump in the federal litigation. Id.

7

from the alleged securities fraud. Id. at 402. In refusing to exercise supplemental jurisdiction over Trump's state constitutional challenge, the district court reasoned that "state courts should be given the opportunity to interpret their state constitutions," and since "[o]nly the New Jersey Supreme Court can give an authoritative construction of the New Jersey Constitution." Id. at 408, the court exercised its discretion and refused to hear Trump's state law claims.5

## II.

Our standard of review of a dismissal under Rule 12(b)(6) is plenary. When reviewing a motion to dismiss for want of standing, we must accept as true all material allegations of the complaint and must construe the complaint in favor of the plaintiff. Warth v. Seldin, 422 U.S. 490, 501 (1975). A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff 's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint. ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994).

## III.

Trump argues that the use of bonds issued by the SJTA as a part of the funding mechanism violates Article IV, S 7, P 2 of the New Jersey Constitution, which Trump argues strictly limits the use of casino derived revenues to projects and programs that benefit senior and disabled citizens of the State of New Jersey. Trump further argues that neither the CRDA nor the SJTA plan to disclose this purported constitutional infirmity to potential purchasers of the bonds. Thus, argues Trump, the issuance of the bonds would constitute securities fraud in violation of the Securities and Exchange Act of 1934, and the Securities

_____

5. On May 14, 1977, the New Jersey state court held that the statutes challenged by Trump in the federal action were valid under the New Jersey constitution. Trump has appealed that decision and briefs on the appeal have been filed with the appellate division of the state court.

8

and Exchange Commission Rule 10b–5. Consequently,
Trump seeks to enjoin the sale of the bonds.6

_____

6. Although we need not dwell upon the intricacies of New Jersey's
casino financing laws as part of our resolution of this appeal, this
dispute is best understood in context with applicable state statutes, and
relevant provisions of the New Jersey Constitution. Accordingly, we
briefly describe them here in the margin:

On November 2, 1976, New Jersey voters approved an amendment to
the New Jersey Constitution which permitted the Legislature to authorize
the establishment and operation of gambling casinos in Atlantic City.
However, the amendment required that any such legislation

        shall provide for the State revenues derived therefrom to be
applied
        solely for the purpose of providing funding for reductions in
property
        taxes, rental, telephone, gas, electric, and municipal utilities
charges
        of, eligible senior citizens and disabled residents of the State,
and
        for additional or expanded health services or benefits or
        transportation services or benefits to eligible senior citizens and
        disabled residents, in accordance with such formulae as the
        Legislature shall by law provide.

N.J. Const. art. IV, S 7, P 2, subparagraph D. The 1977 Casino Control
Act was enacted pursuant to this amendment. The Casino Control Act
established a tax on a casino's "gross revenues." N.J.S.A. 5:12–24. All
funds derived from this tax were to be placed in a special fund referred
to as the "Casino Revenue Fund." N.J.S.A. 5:12–145(a), which would be
used exclusively for programs to assist the elderly and disabled. N.J.S.A.
5:12–145(c). The Act also required casino licensees whose gross revenues
exceeded the capital cost of constructing their casinos to make
additional investments in Atlantic City. Any licensee that failed to make
the required investments would be subject to an alternative investment
tax on gross revenues dedicated to the Casino Revenue Fund. N.J.S.A.
5:12–144(b)(3); see State of New Jersey and the Casino Reinvestment
Development Authority v. Trump Hotels & Casino Resorts, Inc., No. ATL–L–
1373–97, slip opn. at 6 (N.J. Super. Ct. Law Div., May 14, 1997).

In 1984, the Casino Reinvestment Act of 1984 was enacted to spur
investment. State of New Jersey and the Casino Reinvestment
Development Authority, at 6. The Act created the Casino Reinvestment
Development Authority ("CRDA") to accelerate development and to
provide a focus for reinvestment by the casinos. N.J.S.A. 5:12–153. The
CRDA "was charged to maintain public confidence in the casino
gambling industry as a unique tool of urban development for Atlantic
City; to directly facilitate the redevelopment of existing blighted areas;
and to address pressing social and economic needs by providing eligible

projects in which casino licensees could invest." State of New Jersey, at 6.

Section 10(b) of the Securities Exchange Act of 1934
provides:

> It shall be unlawful for any person, directly or
> indirectly, by the use of any means or instrumentality
> of interstate commerce or of the mails, or of any facility
> of any national securities exchange . . .
>
> (b) To use or employ, in connection with the purchase
> or sale of any security, . . . any manipulative or
> deceptive device or contrivance in contravention of
> such rules and regulations as the Commission may
> prescribe . . . in the public interest or for the protection
> of investors.

15 U.S.C. S 78j(b)(emphasis added). Securities and
Exchange Commission Rule 10b-5 was promulgated
pursuant to Section 10(b) of the Act. That Rule provides:

_____

In 1993, the New Jersey Legislature amended the Casino Control Act
by enacting the Parking Fee Act "to accelerate the CRDA's efforts to
develop the Atlantic City `corridor region' (the infrastructure connecting
the Atlantic City Expressway to the Boardwalk)." State of New Jersey, at
7. The Legislature imposed a $2.00 fee on consumers who parked at
casino-controlled parking facilities and required that $1.50 of this
amount to be remitted to the CRDA whether or not the consumer used
or entered the casino facility. N.J.S.A. 5:12-173.3. Id. Proceeds are
deposited in a special account in the State Treasury to be used for,
among other things, any project that the CRDA determines is "related to
improving highways, roads, infrastructures, traffic regulation and public
safety" in the corridor region. N.J.S.A. 5:12-173.4. The Legislature also
authorized the CRDA to sell bonds to finance such projects and to pledge
parking fee proceeds to repay the indebtedness. N.J.S.A. 5:12-173.6,
173.7.

Mirage, the State of New Jersey and its various agencies entered into
the Road Agreement under certain of these New Jersey statutes, viz.,
N.J.S.A. 5:12-173.1 - 173.7 (requiring the CRDA to collect parking fees
to fund "eligible projects") and N.J.S.A. 5:12-144.1 and N.J.S.A. 5:12-173
(requiring casino licensees both to purchase bonds issued by the CRDA
and to make investments in eligible projects approved by the CRDA). In
one of its state law causees of action, Trump asked the district court to
declare these enabling statutes unconstitutional under the New Jersey
Constitution. However, the district court refused to exercise
supplemental jurisdiction over the constitutional challenge and
dismissed it without prejudice.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. S 240.10b-5 (emphasis added). For our purposes, the operative phrase in both the statute and the regulation is "in connection with the purchase and sale." Trump does not allege that it intends to purchase the bonds when, and if, they are issued. Thus, the threshold issue is whether Trump has standing to bring this action.

A.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Warth v. Seldin, 422 U.S. 490, 498 (1975). Standing "subsumes a blend of constitutional requirements and prudential considerations." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982). Obviously, satisfying the Article III "case or controversy" requirement is the "irreducible constitutional minimum" of standing.7 Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Article III constitutional standing contains three elements: (1) the plaintiff must have suffered

_____

7. The constitutional dimensions of the standing question bear a close relationship to the questions of ripeness and mootness. See Warth v. Seldin, 422 U.S. at 499 n.10.

11

an injury in fact -- an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of -- the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. Id. at 560-61 (citations, internal quotations, brackets and ellipses omitted).

In addition to the " `immutable requirements of Article III,' the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." Bennett v. Spear, ___ U.S. ___, 117 S. Ct. 1154, 1161 (1997) (citation omitted). They are: (1) "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties," Valley Forge Christian College, 454 U.S. at 474 (citation omitted); (2) "even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Article III, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances pervasively shared and most appropriately addressed in the representative branches," Id. at 474-75 (citation omitted); and (3) "the plaintiff 's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Id. (citation and internal quotations omitted).

It is this latter "zone of interests" consideration which is of paramount concern here. Although the "zone of interests" consideration had its origin in the context of judicial review proceedings under the Administrative Procedures Act ("APA"), see Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150 (1970), it is now clear that it applies "in suits not involving review of federal administrative action," and it is one "among other prudential standing requirements of general application." Bennett v. Spear, 117 S. Ct. at 1161.

B.

It is by no means certain that Trump has alleged sufficient injury to achieve Article III standing here. However, even if the allegations of fraud in the issuance of securities that Trump does not intend to purchase are sufficient for purposes of Article III, they clearly fall outside the zone of interests protected by the SJTA, section 10(b) of the Securities Act, and Rule 10b-5.

The Supreme Court has held that only a purchaser or seller of a security has standing to bring a private 10b-5 securities fraud action for money damages. Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). However, Trump is not bringing a private damages action under 10b-5. Rather, Trump seeks injunctive relief against what it claims is an impending 10b-5 violation, and it claims standing based on a pre-Blue Chip Stamps decision of this court, Kahan v. Rosenstiel, 424 F.2d 161 (3d Cir. 1970). In Kahan, we carved out a narrow exception to the "Birnbaum rule" and held that the non-purchasing or non-selling plaintiff of a security has standing to request injunctive relief for a 10b-5 violation.

The Birnbaum rule takes its name from Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), which was decided twenty-three years before the Supreme Court's Blue Chip Stamps decision. In Birnbaum the court examined the legislative history of securities legislation and concluded that Rule 10b-5 "extended protection only to the defrauded purchaser or seller" of the security at issue. Id. at 464. Thus was born the Birnbaum purchaser/seller rule. In Blue Chip Stamps, the Supreme Court expressly declared that "Birnbaum was rightly decided." 421 U.S. at 731.

Kahan was decided eighteen years after Birnbaum, but five years before Blue Chip Stamps. In Kahan we reviewed then existing precedent in the Second Circuit and concluded that, despite the Birnbaum rule, Second Circuit jurisprudence allowed a non-purchasing or non-selling plaintiff to bring an action for injunctive relief under 10b-5. We stated "[t]he purchase-sale requirement must be interpreted so that the broad design of the Exchange Act, to prevent inequitable and unfair practices on securities

13

exchanges and over-the-counter markets, is not frustrated by the use of novel or atypical transactions." 424 F.2d at 171. Accordingly, we held that

> [n]either the language of S 10(b) and Rule 10 b-5 nor the policy they were designed to effectuate mandate adherence to a strict purchaser-seller requirement so as to preclude suits for [injunctive] relief if a plaintiff can establish a causal connection between the violations alleged and the plaintiff's loss.

Id., at 173.

Trump argues that this "relaxed standing" rule of Kahan survived Blue Chip Stamps. Mirage argues to the contrary citing Cowin v. Bresler, 741 F.2d 410 (D.C. Cir. 1984) to support its position that Blue Chip Stamps sounded the death knell for the "relaxed standing" rule. In Cowin, the court held that the Blue Chip Stamps purchaser-seller limitation applies with equal force to equitable actions.

We have not, heretofore, squarely addressed this issue. In Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 194 (3d Cir. 1976), a panel of this court assumed that the "relaxed standing" rule of Kahan survived Blue Chip Stamps, but held that the case before it did not fit into that rule. 540 F.2d at 194. In Sharp v. Coopers & Lybrand, 649 F.2d 175, 186 n.15 (3d Cir. 1981), overruled in part on other grounds, In re Data Access Systems Securities Litigation, 843 F.2d 1537 (3d Cir. 1988)(en banc), we wrote that Blue Chip Stamps precludes a non-purchaser or non-seller from seeking injunctive relief for an impending 10b-5 violation. However, that reference is clearly dicta, and not part of the holding. 649 F.2d at 187 n.15.

Thus, we have yet to decide whether a non-purchasing or non-selling plaintiff continues to have standing to seek injunctive relief for an alleged 10b-5 violation after Blue Chip Stamps. However, resolution of that question must await yet another day as we need not now decide it to resolve the case at bar. Whether or not the relaxed standing rule survives Blue Chip Stamps, the injuries that Trump alleges here are not within the zone of protection established by S 10(b) and Rule 10b-5 regardless of the relief sought. Furthermore, Trump has not established the

14

prerequisite nexus between the injuries it claims, and the securities violations that it alleges. Even under Kahan's rule of relaxed standing, one seeking injunctive relief had to establish a "causal connection between the violations alleged" and the loss claimed. See Kahan, 424 F.2d at 173. As noted above, there we stated that we would not strictly adhere to the "purchase-seller requirement . . . if a plaintiff could establish a causal connection between the violations alleged and plaintiff's loss." (emphasis added). Here, Trump has not established any such causal link. Accordingly, we hold that the injuries that Trump alleges are insufficient to confer standing to seek relief under either Blue Chip Stamps, or our holding in Kahan.

Trump has no intention of purchasing the bonds, and, therefore, is not a member of the universe of potential investors.8 Consequently, it cannot demonstrate that it would suffer an injury sufficiently connected to the securities fraud it alleges.9 Trump argues, in part, that it must be allowed to bring this action because of the unique circumstances surrounding an offering of government bonds. At oral argument Trump suggested that its role in enjoining this sale of securities without proper disclosure is tantamount to acting as a private attorney general on behalf of the investing public, and the public in general, and this is sufficient to confer standing. However, Trump is obviously aware of the purported infirmity that it alleges in this offering. The claimed constitutional infirmity was the

_____

8. In view of Trump's allegations, it would not further Trump's position to allege an intention to purchase as Trump could not, in good faith, assert that it had relied upon the alleged fraudulent conduct. In order to state a securities fraud claim under S 10(b) and Rule 10b-5, a private plaintiff must plead that he or she "reasonably relied on the misrepresentation or omission and . . . consequently suffered damage." In re Westinghouse Securities Litigation, 90 F.3d 696, 710 (3d Cir. 1996).

9. Trump is not at all in the same position as was Kahan in Kahan v. Rosenstiel. Kahan was a minority shareholder and, assuming the truth of the allegations in his complaint, was being offered less money for his shares than was the majority shareholder. Thus, Kahan stood to suffer a loss in the value of his investment because of the alleged securities fraud. Trump cannot demonstrate a loss from an investment it will never make.

15

basis of state court litigation and it must now be disclosed to prospective purchasers. That disclosure adequately protects the investing public without a tortured standing analysis under federal securities laws. Section 10(b) and Rule 10b-5 reflect a "strong federal interest .. . in ensuring a proper flow of information between the parties to a securities transaction." Lewis v. Chrysler Corp., 949 F.2d 644, 649 (3d Cir. 1991)(quoting Healey v. Catalyst Recovery of Pennsylvania, Inc., 616 F.2d 641, 646 (3d Cir. 1980)). As we wrote in Kahan:

> The Act was designed to eliminate deceptive and unfair practices in security trading and to protect the public from inaccurate, incomplete and misleading information. The thrust of the Act and the decisions interpreting it is to give the investing public the opportunity to make knowing and intelligent decisions regarding the purchase and sale of securities.

Kahan, at 173 (emphasis added).

Aside from nebulous allegations of environmental harm and harm to the Atlantic City community, Trump's essential complaint is that the proceeds from the sale of the bonds will be used to build a highway and tunnel which will funnel traffic from the Atlantic City Expressway to the multi-casino complex Trump's competitor will build on the H-Tract. The highway and tunnel, once completed, will be a boon for Mirage and Trump fears economic loss. Admittedly, there is a highly attenuated connection between the funding scheme and Trump's claimed "injury". However, that "injury" is much too tenuous to be regarded as arising from the alleged securities fraud. The injury results from the highway that will bring traffic to Trump's competitor. Trump's assertion that the injuries are within the zone of interests protected by S 10(b) and Rule 10b-5 requires us to stretch reality as well as precedent past the breaking point. We refuse to do so. Accordingly, we hold that Trump has no standing to seek injunctive relief against the issuance of the bonds.

IV.

Two small matters remain. First, Trump claims that the district court abused its discretion by "failing to provide

16

Trump with an opportunity to supply further particularized allegations of fact to support its standing." Appellant's Br. at 47. However, Trump never requested leave of the district court to amend or supplement its complaint. Therefore, it cannot raise that issue on appeal. Mann v. Conlin, 22 F.3d 100, 103 (6th Cir. 1994)(where plaintiff never requested leave to amend in the district court, that argument is not properly before appellate court).

Second, as noted above, Trump has appealed from the district court's decision to refrain from exercising supplemental jurisdiction over its state law claim that the proposed funding scheme violates the New Jersey Constitution. However, supplemental jurisdiction is exercised as a matter of discretion. See Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995). A court may decline to exercise supplemental jurisdiction over a state law claim where "the claim raises a novel or complex issue of state law." 28 U.S.C. S 1367(c)(1). Clearly, the question of whether the proposed funding scheme for the Westside Connector violates the New Jersey Constitution is a complex issue of state law which is better left to the New Jersey courts to determine. See Doe v. Sundquist, 106 F.3d 702, 708 (6th Cir. 1997)(declining to exercise supplemental jurisdiction, in part, "out of respect for the right of a state court system to construe that state's own constitution."). Thus, we believe that the district court did not abuse its discretion by refusing to exercise supplemental jurisdiction over the state law constitutional claim.

V.

For the above reasons, the judgment of the district court will be affirmed.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

17