**Aron ROSENBERG, Plaintiff,**

v.

**XM VENTURES, a Maryland Trust, and Motient Corporation, a Delaware Corporation, Defendants.**

**No. CIV. A. 00–528 GMS.**

United States District Court, D. Delaware.

Jan. 23, 2001.

---

682

Joseph A. Rosenthal, Jeffrey S. Goddess, Rosenthal, Monhait, Gross & Goddess, Wilmington, DE, Law Office of Jeffrey S. Abraham (Jeffrey S. Abraham, of counsel), Jack G. Fruchter, Mitchell M.Z. Twersky, Fruchter & Twersky, New York, NY, for Plaintiff.

Allen M. Terrell, Jr., Peter B. Ladig, Richard, Layton, & Finger, Wilmington, Timothy J. Finn, Jones, Day, Reavis & Pogue, Washington, DC for Defendants.

## MEMORANDUM AND ORDER

SLEET, District Judge.

The plaintiff, Aron Rosenberg ("Rosenberg") owns shares of stock of the defendant Motient Corporation ("Motient" or "the Company"). On June 5, 2000, Rosenberg filed a shareholder derivative lawsuit against Motient and an entity known as XM Ventures ("XM"). In this action, Rosenberg requests, among other things, that the court order XM to transfer to Motient profits that XM realized as a result of its acquisition and sale of equity securities issued by the Motient. Rosenberg seeks this relief pursuant to the provisions of Section 16(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78p(b)[1] ("the Act" or "Section 16(b)"). XM has challenged the propriety of the requested relief by filing a motion to dismiss Rosenberg's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Because XM was not a part of a group that owned more than a 10 percent beneficial interest in Motient prior to the acquisition and sale by XM of Motient's stock, the court will uphold that challenge, and grant XM's motion to dismiss Rosenberg's complaint with prejudice.

## I. BACKGROUND

The court will set forth in brief the facts pertinent to its discussion of the merits of XM's motion. Motient is a Delaware corporation which was formerly known as the American Mobile Satellite Corporation ("AMSC"). Motient owned 80 percent of the outstanding shares of AMRC Holdings, Inc. ("AMRC"). WorldSpace, Inc. ("WorldSpace") owned the other 20 percent of the outstanding shares of AMRC. AMRC subsequently changed its name to XM Satellite Radio Holdings, Inc. ("XM Holdings"). On June 7, 1999, Motient (formerly AMSC), XM Holdings (formerly AMRC), and WorldSpace entered into an agreement known as the Exchange Agreement. Among other reasons, the Exchange Agreement was executed for the purpose of enabling WorldSpace to transfer its shares of XM Holdings to Motient in exchange for the transfer by Motient to WorldSpace of 8,614,244 shares of Motient stock. By the terms of the Exchange Agreement, WorldSpace was to transfer its interests in XM Holdings to a grantor trust which was to be established by WorldSpace prior to the Closing. The Exchange Agreement identified XM Ventures as the grantor trust. In turn, XM was to transfer the WorldSpace assets to Motient in exchange for the transfer to XM of the above mentioned shares of Motient stock.

The Closing contemplated by the Exchange Agreement occurred on July 7, 1999, during which 6,479,443 shares of Motient were transferred to XM. The Exchange Agreement also provided that the remaining shares were to be acquired on September 7, 1999, after the vote of Motient shareholders approving the transfer to XM. Subsequently, Rosenberg alleges, between September 1, 1999, and February 10, 2000, XM sold some of the stock it acquired pursuant to the Exchange Agreement.

Rosenberg complains that because XM was a member of a group which was the

---

1. This section of the Act deals with, among other things, profits made within six months from the purchase and sale or sale and purchase of an issuer's securities by a beneficial owner of more than 10 percent of the issuer. Section 16(b) provides in relevant part that: "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer ... within any period of less than six months ... shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months ... This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or sale and purchase, of the security involved ..." 15 U.S.C. § 78p(b) (1994).

beneficial owner of more than 10 percent of Motient's stock, and because these transactions took place within a six month period after the group's acquisition of the Motient shares, the transactions are covered by Section 16(b). As a result, Rosenberg argues the profits realized upon the sale of the stock by XM are recoverable by Motient. In contrast, XM argues in its motion to dismiss that Rosenberg's conclusory allegations notwithstanding, XM was not a 10 percent beneficial owner of Motient until *after* it acquired Motient's stock. As a result, according to XM, Section 16(b) by its terms does not cover the September to February transactions.

Rosenberg further argues that even if the July 7th transaction did not bring XM within the purview of Section 16(b), the September 7th transaction was an "[a]dditional [p]urchase [which] would have caused XM to become the beneficial owner of more than 19.9% of the Company's common stock." Rosenberg's "additional purchase" theory is based upon his assertion that the completion of the stock purchase (the transfer of the remaining 2,141,801 of the total 8,614,244 shares) was contingent upon the satisfaction of certain conditions precedent. Among those conditions was the September 7th vote by the shareholders of Motient approving the second transfer. According to Rosenberg, this event constituted an "additional purchase." Finally, he claims that because any profit realized by XM on the sale of these shares was realized within six months of the second acquisition, XM is subject to the disgorgement provisions of Section 16(b).

In response, XM contends that the Exchange Agreement fixed its rights and obligations as of the date of the agreement's execution, June 7, 1999. According to XM, this is the controlling event for purposes of determining Section 16(b) liability. Further, XM maintains that the shareholder approval for the second transfer of Motient stock required by the Exchange Agreement "was only an incidental formality made necessary by NASDAQ regula-

tions," and that no other conditions existed. Thus, according to XM, its acquisition of all of the 8,614,244 shares of stock at issue comprises a single transaction which occurred at a time that would not require the return to Motient of profits earned on the subsequent sale of any of those shares.

With these facts and arguments in mind, the court will address XM's motion to dismiss.

## II. STANDARD OF REVIEW

■ A motion to dismiss pursuant to the provisions of Rule 12(b)(6) should not be granted unless, accepting all allegations in the complaint as true and viewing them in a light most favorable to the plaintiff, the court rules that the plaintiff is not entitled to relief as a matter of law. *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 183 (D.Del.2000) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997)); *see also Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir.1998) ("A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington*, 114 F.3d at 1420.

Before deciding XM's motion to dismiss, the court must first address whether it needs to consider matters outside of the pleadings to decide the motion. Rosenberg contends that the court must consider extrinsic documents to decide XM's motion to dismiss. Thus, he has filed a motion to convert XM's motion to dismiss into a motion for summary judgment. In paragraph 5 of his motion, Rosenberg argues that because XM "seeks to place before this Court, as Exhibit B to its motion to dismiss, a document tilted 'American Mobile Stockholder Agreement' which has not

been, in any way, authenticated," XM's motion should be decided on a summary judgment standard. *See* D.I. 15. In paragraph 1 of his motion, in a partial reference to the legal standards that govern the court's consideration of this issue, Rosenberg contends that the question of whether the court should apply a Rule 12(b)(6) or a Rule 56 standard depends upon "if the court considers matters outside the pleadings." *Id.*[2]

The court will deny Rosenberg's motion because the only documents[3] it need consider to resolve XM's motion to dismiss are the Exchange Agreement and two additional matters which were publicly filed, and on which Rosenberg himself relies here and to which he makes express reference in his complaint. Thus, the court can consider the Exchange Agreement in resolving XM's motion to dismiss without converting the motion into one for summary judgment. *See In re Burlington Coat Factory, Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997) (" 'document[s] integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' ") (citations omitted). Since no other matters outside the pleadings (the Complaint) will be considered, the court need not address the merits of Rosenberg's arguments, and will deny his cross motion to convert XM's motion to dismiss into a motion for summary judgment.

The court will now turn to the substance of XM's motion to dismiss.

## III. DISCUSSION

■ In *Foremost–McKesson, Inc. v. Provident Securities Company*, the Supreme Court addressed the question of "whether a person purchasing securities that put his holdings above the 10% Level is a beneficial owner 'at the time of the purchase' so that he must account for profits realized on a sale of those securities within six months." 423 U.S. 232, 235, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976). The Court answered the question as follows: "We hold that, in a purchase-sale sequence, a beneficial owner must account for profits only if he was a beneficial owner '*before* the purchase.' " *Id.* at 249–250, 96 S.Ct. 508. (emphasis added.). There seems to be no disagreement between the parties on this fundamental principal.

■ The parties also agree that the Act, its regulations, and relevant case law provide that in order to be subject to the recapture provisions of Section 16(b), a beneficial owner need not be a single individual or entity, but may be "any person who is deemed a beneficial owner pursuant to section 13(d)" of the Act. 17 C.F.R. § 240.16a–1(a). They agree further that section 13(d) provides that a "person" may be a group, and that a group may consist of "two or more persons." 15 U.S.C. § 78m(d)(3) (1994). They also agree that "[i]f two or more persons are determined to be a 'group' for the purposes of section 13(d), their stock holdings are aggregated to determine whether they are beneficial owners of 10% of the issuer's stock." *Morales v. Quintel Entm't, Inc.*, 72 F.Supp.2d 344, 347(S.D.N.Y.1999).

■ It appears that the parties disagree over what factors go into the determination of whether a group exists within the meaning of Section 16(b), and what pleading standard the court should apply in determining the sufficiency of Rosenberg's

---

**2.** As an aside, the court will remind Rosenberg that he is the party who has sought to have the state of the record declared sufficient to have the court to apply the more rigorous summary judgment standard in its analysis. Further, it would appear that he is content with the sufficiency of the record for this purpose. Neither in his arguments in support of his motion to convert XM's motion to dismiss into one for summary judgment or his opposition to XM's motion to dismiss does Rosenberg seek to supplement the record which is presently before the court.

**3.** *See infra* note 6.

allegations of the existence of a group.[4] A close examination of their briefs, however, reveals that there is, in fact, accord on the definition of the term "group" for purposes of the Act. Indeed, the parties each cite the *Wellman v. Dickinson* case in which the Second Circuit instructs that "the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." 682 F.2d 355, 363 (2d Cir.1982). Further, although they cite different supporting authorities, the parties agree that a group is formed when its members have at some point in time agreed to act together to acquire, hold, vote or dispose of securities of an issuer. *Bayly Corp. v. Marantette*, No. 82–1354, 1982 WL 1337, at *12 (D.D.C. Oct.19, 1982); *see also* 17 C.F.R. § 240.13d–5(b)(1).

Thus, the parties agree on the principals of law that must be applied to determine this first portion of their dispute. The initial point of departure between them occurs on the issue of whether Rosenberg has adequately pleaded that XM was a beneficial owner of Motient stock at the time the shares at issue were acquired, thus, subjecting the acquisition and subsequent sale to the terms of Section 16(b).

### A. Whether XM was a beneficial owner of Motient stock within the meaning of Section 16(b)?

■ XM argues that Rosenberg has not properly alleged, and will be unable to do so in the future, that XM was a 10 percent beneficial owner *before* it purchased shares of Motient. According to XM, there are at least two reasons for this failure and fu-

ture impediment. First, XM notes that there is no allegation whatsoever that XM was, "by itself, a beneficial owner of any Motient stock *prior* to its acquisition of this stock under the Exchange Agreement." Next, XM contends that section 2.1(a) of the Exchange Agreement demonstrates that "XM Ventures did not even exist prior [to] this transaction."

Rosenberg makes no attempt to refute the first of these contentions. As to the second, however, he argues that XM was not contractually bound to complete the purchase transaction "until several condition precedents (sic) had been satisfied." Further, he claims, pursuant to the provisions of paragraph 2.1(a) of the Exchange Agreement, one of those conditions was that "XM was required to be formed at least 5 days prior to the Closing Date." Thus, contends Rosenberg, "it is a logical syllogism that XM existed prior to the Closing Date."

Although paragraph 2.1(a) of the Exchange Agreement requires that "WorldSpace shall establish XM Ventures," the only time prescription for this act is that it must be accomplished "[p]rior to the Closing." What must happen "no later than five (5) Business Days prior" is that Motient must be notified, by either "WorldSpace or XM Ventures, as the case may be," "of the identity of the trustee or any successor trustee." [5] Thus, by its very terms, the paragraph upon which Rosenberg relies for support seems to fail him. The most that can be reasonably be inferred from the language of paragraph 2.1(a) of the Exchange Agreement is that, at some point prior to the consummation of the

---

4. As XM notes in its Reply Brief, Rosenberg seems to suggest that XM seeks to "hold him to the 'heightened pleading standards' of Fed. R.Civ.P. 9(b) rather than the 'notice pleading' requirements of Fed.R.Civ.P. 8." XM points out, however, that it "does not contend that a section 16(b) complaint must satisfy the pleading requirements of Fed.R.Civ.P. 9(b)". The court will *not* apply a Rule 9(b) standard in its analysis of the sufficiency of Rosenberg's complaint.

5. Paragraph 2.1(a) of the Exchange Agreement provides in relevant part that "Prior to Closing, WorldSpace shall establish XM Ventures as an irrevocable trust in which WorldSpace shall have no reversionary interest.... WorldSpace or XM Ventures, as the case may be, shall give AMSC written notice of the identity of the trustee or any successor trustee no later than five (5) Business Days prior to appointment of the trustee or successor trustee."

share purchase by XM, XM had to be established. The fact that either XM or WorldSpace could provide the required notice of identity strongly suggests that XM need not have come into existence until right up until Closing time. It does not follow from this that XM was a beneficial owner within the meaning of Section 16(b) and the Supreme Court's ruling in *Foremost–McKesson*. Simply put, this paragraph does not support, even for Rule 12(b)(6) purposes, the conclusion that XM, either by itself, or as a member of a group, owned more than 10 percent of Motient *prior* to the Closing.

Moreover, a document upon which Rosenberg relied in drafting his complaint would seem to be dispositive on this point.[6] As noted in paragraph 19 of Rosenberg's complaint, on or about July 19, 1999, XM filed a document known as a Schedule 13D. At page 3 of the Schedule 13D the following language appears in the first paragraph under Item 2 Identity and Background; "This Statement is being filed by Noah A. Samara as trustee of XM Ventures. XM Ventures is an irrevocable grantor trust established under Maryland law on July 7, 1999."

Given the language of the Exchange Agreement discussed above and the language of the Schedule 13D just noted, the court must conclude that XM did not exist[7] prior to July 7, 1999, the date of the Closing. Thus, it is clear that Rosenberg cannot on this, or any future, record establish XM's membership in a group at a time that would subject it to the requirements of Section 16(b).

Rosenberg makes two additional arguments in support of his contention that the transaction at issue is subject to the short swing profits provisions of Section 16(b).

Rosenberg first contends that it can be concluded from the structure of the Exchange Agreement that WorldSpace acted as XM's agent because "it is reasonable to infer from the facts currently in the record that XM specifically requested that the Group be formed to insure XM's acquisition of the Additional shares." A critical flaw in this argument is the fact that WorldSpace, whether as principal or agent, could not have been a member of an ownership group prior to the purchase because it never owned any Motient stock prior to the transaction in question.[8]

**6.** Rosenberg does not argue, nor could he successfully, that the court's consideration of the Schedule 13D filing requires the application of a Rule 56 standard to XM's motion to dismiss. It is well settled that public records can be considered on a motion to dismiss. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1197 (3d Cir. 1993). "Securities and Exchange Commission ("SEC") filings fall within this category of public records ...." *Diceon Electronics, Inc. v. Calvary Partners, LP*, 772 F.Supp. 859, 860 (D.Del.1991) (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir.1991)).

**7.** But even if XM existed before the closing and was a member of a 13D group, it could not have been a member for Section 16(b) purposes because it had no equity interest in Motient *prior* to the stock purchase in question. The purpose of Section 16(b) is to prevent insiders who may have access to information about their corporations not available to the rest of the investing public from "reap[ing] profits at the expense of less well informed investors." *Foremost–McKesson* at 243, 96 S.Ct. 508. By the terms of Section

16(b), XM could not have been an insider because it owned no beneficial interest in Motient until the closing on July 7, 1999. In other words, it is the initial purchase of Motient stock by XM that made it a beneficial owner of more than 10 percent of the issuer. Section 16(b) does not apply to an initial purchaser under these circumstances. *Id.* at 249–250, 96 S.Ct. 508.

**8.** In its opposition papers to the motion to dismiss, Rosenberg requests "[i]n the event the Court were to find that XM was not a member of the Group ... plaintiff should be given leave to amend, pursuant to Fed R. Civ. P. 15(a), to add WorldSpace as a defendant." D.I. 14, at 15. The court will deny this request because amendment would be futile in this instance. WorldSpace did not own Motient stock prior to the transaction in question. Thus, Rosenberg cannot establish that WorldSpace was a beneficial owner of Motient stock within the meaning of Section 16(b). *See Foman v. Davis*, 371 U.S. 178, 181, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (holding that futility of amendment is a valid basis for denying a motion to amend).

Rosenberg does not, nor could he, make a well founded contrary allegation in his complaint.

Next, Rosenberg alleges in paragraph 9 of his complaint that, "various agreements, formal and informal ... created a group which acted together for the purpose of acquiring, holding or voting the Company's equity securities within the meaning of Section 13(d)" and that "[a]t all relevant times that group included XM : .." A critical flaw in this contention is that these averments are nothing more than unsupported, conclusory allegations that will not sustain a finding of Section 16(b) liability.

The principle problem with both of these additional arguments, however, is that each of them is dependent upon Rosenberg's ability to establish that XM existed at a time prior to that established by the record before the court. The court rejects these arguments because, as XM appropriately notes, they are offered in "defi[ance] of common sense" because each of them relies upon XM's existence at a time "before it was created."

The court will now address Rosenberg's two transaction theory.

## B. Whether XM Ventures Second Transaction is Subject to Section 16(b)?

■ As previously noted, Rosenberg's · main alternative argument seeks to persuade the court that even if XM was not a member of a group owning more than a 10 percent beneficial interest in Motient as of the July 7th Closing, the sale by XM of any of the 2,141,801 shares acquired during the so-called "second purchase" on September 7, 1999 is subject to the disgorgement provisions of Section 16(b).

It would seem that since Rosenberg's brief is bereft of citation to *any* authority on this issue (either that which would clearly support his position or, at least, support a proposition sufficiently analogous to lend support to his position), the court might reasonably conclude that the

facts before it are somewhat novel. However, this may not be the case. Indeed, the more accurate conclusion would seem to be, as XM argues, "that [p]laintiff's characterization of the transaction is foreclosed by settled principles of law and the plain language of the Exchange Agreement ..."

In *Blau v. Ogsbury,* 210 F.2d 426 (2d Cir.1954) the Second Circuit Court of Appeals rejected the plaintiff's efforts to bifurcate the purchase of a block of stock by the defendant into two sale and purchase transactions—the first being the actual commitment to purchase the shares and the second being the actual payment of the previously agreed upon purchase price by the plaintiff. The court held that, consistent with its previously expressed view on the subject, for purposes of applying Section 16(b), it is "the time when the alleged insider's rights and obligations [become] fixed that [is] controlling in the application of the statute." *Id.* at 427. The court refused to find "two 'purchases' where in fact but one exist[ed]." *Id.* Similarly, citing *Blau v. Ogsbury,* the Seventh Circuit Court of Appeals, in *Freeman v. Decio,* 584 F.2d 186, 200 (7th Cir.1978), stated that "it is well settled that an insider acquires stock for the purposes of 16(b) when he has 'incurred an irrevocable liability to take and pay for the stock' and his 'rights and obligations' become fixed."

Perhaps, the explanation for the dearth of citations in Rosenberg's answering brief is that, as with other applicable principles of law in this action, the parties agree. What they disagree about is the impact of the requirement that the shareholders of Motient vote their approval of the "second purchase" or, as it is termed in the Exchange Agreement, the "second transfer." XM argues that shareholder approval of the 2,141,801 shares was nothing more than a formality that was required to be made a part of the agreement by Rule 4660(i) of the Nasdaq National Market System. Rosenberg counters that this is nothing more than a "red herring" since all

Rule 4660(i) requires for a valid stock transfer is compliance with the laws of the state of incorporation (in this case the written consent of a majority of the shareholders). *See* Del.Code Ann. tit. 8 § 228. Rosenberg claims that because this choice was not chosen, the court is free to draw an inference that "it was [unknown] regulatory issues beyond the control of the parties that held up the Additional purchase ..."

A close look at the Exchange Agreement and Motient's proxy statement,[9] which was filed with the SEC and attached to Jeffrey S. Abraham's affidavit submitted in support of his opposition to the instant motion to dismiss, suggests that perhaps it is Rosenberg who raises the proverbial straw man. As XM notes, the only condition precedent to the second transfer was the approval of the transfer by a majority of Motient shareholders. Contrary to Rosenberg's suggestion, and as noted by XM, by the terms of the Exchange Agreement, the so-called regulatory issues (obtaining all regulatory approvals) "was a condition precedent of the *closing,* not the second transfer." Indeed, the proxy statement confirms that shareholder approval was only a formality which had the purpose of complying with "the rules of the Nasdaq National Market" even though "the holders of approximately 65% of the Company's Common Stock ... have agreed to vote in favor of the Additional Issuance."

Under these circumstances, the result dictated by the logic of the settled principles announced in *Blau v. Ogsbury* and *Freeman v. Decio* is clear. XM's rights and obligations were fixed at the time of the execution of the Exchange Agreement on June 7, 1999. The court holds, therefore, that it too, like the court in *Blau* "[can not] justify finding two 'purchases' where in fact one exists." For these reasons, IT IS HEREBY ORDERED that:

9. *See supra* note 6.

1. XM Ventures' Motion to Dismiss (D.I.7) is GRANTED pursuant to Fed. R.Civ.P. 12(b)(6); and

2. Rosenberg's complaint is DISMISSED, WITH PREJUDICE.

3. The plaintiff's motion to convert the defendant's motion to dismiss into a motion for summary judgment is DENIED.