

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-27-1999

# Armstrong Surgical v. Armstrong Memorial

Precedential or Non-Precedential:

Docket 97-3440

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Armstrong Surgical v. Armstrong Memorial" (1999). *1999 Decisions.* Paper 217.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/217

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 27, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3440

ARMSTRONG SURGICAL CENTER, INC.,

     Appellant,

v.

ARMSTRONG COUNTY MEMORIAL HOSPITAL; ROGELIO
BORJA; RICHARD BOSCO; ZAFAR CHOWDHRY; JEFFREY
DAVID; FRANK DAVIE; EGBERT DEVRIES; PAUL L.
FREDERICK; JOHN GARROTT; FRANK N. GENOVESE;
IRVING KLEIN; DAVID H. KOHL; LEE H. KOSTER; JOHN
MARTY; MICHAEL P. ONDICH; KARL R. SALTRICK;
WILLIS SHOOK; ANTHONY SMALDINO; PETER SOTOS;
JAE T. YANG

On Appeal From The United States District Court
For The Western District Of Pennsylvania
(D.C. Civil No. 96-01384)
District Judge: Honorable Gustave Diamond

ARGUED APRIL 23, 1998

BEFORE: NYGAARD and STAPLETON, Circuit Judges
and SCHWARTZ,* District Judge.

(Filed July 27, 1999)

_____

* Honorable Murray M. Schwartz, Senior Judge for the United States
District Court for the District of Delaware, sitting by designation.

John L. Laubach, Jr.
John P. Klee
Laubach & Fulton
104 Broadway Avenue
Carnegie, PA 15106-2421

James G. Park (Argued)
374 Midway Road
Pittsburgh, PA 15216

 Attorneys for Appellant

Alan A. Garfinkel
Klett, Lieber, Rooney & Schorling
One Oxford Centre, 40th Floor
Pittsburgh, PA 15219-6498

Jules S. Henshell (Argued)
Klett, Lieber, Rooney & Schorling
240 North Third Street, Suite 600
Harrisburg, PA 17101

 Attorneys for Appellee
 Armstrong County Memorial
 Hospital

Wendelynne J. Newton (Argued)
Sheila S. DiNardo
Buchanan Ingersoll Professional
 Corporation
One Oxford Centre, 20th Floor
301 Grant Street
Pittsburgh, PA 15219-1410

 Attorneys for Appellees
 Rogelio Borja, Richard Bosco,
 Zafar Chowdhry, Jeffrey David,
 Frank Davie, Egbert Devries, Paul
 L. Frederick; John Garrott, Frank
 N. Genovese, Irving Klein, David H.
 Kohl, Lee H. Koster, John Marty,
 Michael P. Ondich, Karl R. Saltrick,
 Willis Shook, Anthony Smaldino,
 Peter Sotos and Jae T. Yang

2

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Appellant Armstrong Surgical Center, Inc. (the "Surgical Center") contends that Armstrong County Memorial Hospital and nineteen of its staff physicians (the "Hospital Defendants") conspired to prevent it from establishing an ambulatory surgery center, thereby restraining and monopolizing trade in violation of sections 1 and 2 of the Sherman Act. The District Court dismissed the complaint after concluding that the alleged conduct was immune from antitrust scrutiny. We will affirm.

I.

We review the District Court's order dismissing the Surgical Center's complaint de novo. See Jeremy H. v. Mount Lebanon Sch. Dist., 95 F.3d 272, 277 (3d Cir. 1996). In reviewing that order, we employ the same standard the District Court used, accepting as true all factual allegations contained in the complaint and all reasonable inferences that can be drawn therefrom. See Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co. , 113 F.3d 405, 411 n.2 (3d Cir.), cert. denied, 118 S. Ct. 435 (1997).

II.

The Surgical Center has plans to build a free-standing ambulatory surgery center in the city of Kittanning, Armstrong County, Pennsylvania. If constructed, that facility would provide outpatient surgical services, including both general surgery and various specialities. Currently, the Hospital is the only facility with operating rooms in Armstrong County, and the nineteen staff physician defendants perform the vast majority of surgeries in the county. Only one independent ambulatory surgery center operates in the four counties that border Armstrong County, and this center is approximately fifty miles from the Surgical Center's proposed site. If constructed, the Surgical Center's facility would compete directly with the

3

Hospital and its staff physicians in the outpatient surgery market. Moreover, the Surgical Center alleges that it would offer outpatient surgical services at prices significantly lower than the Hospital's.

Under the Pennsylvania Health Care Facilities Act, anyone proposing to establish a new health care facility must first obtain a Certificate of Need ("CON") from Pennsylvania's Department of Health. See Pa. Stat. Ann. tit. 35, S 448.701(a)(2). The Act seeks to ensure"the orderly and economical distribution of health care resources to prevent needless duplication of services." Id. at S 448.102. The Department individually reviews CON applications in an extensive proceeding consisting of an investigation, an evaluation of submitted materials, and a public hearing. During this review, the Department considers various health planning issues, including the adequacy of existing health care providers and the need for additional services or facilities. See id. S 448.707. Interested parties, including health care providers who supply similar services in the area, may petition for public meetings or hearings and submit information to the Department on any CON application. See id. SS 448.103, 448.704(b).

In March of 1991, the Surgical Center filed an application for a CON with the Department as required. Thereafter, according to the Surgical Center's complaint, the Hospital defendants, including fourteen physicians who originally supported the Surgical Center's project, entered into a conspiracy to subvert establishment of the new facility. The alleged conspiracy involved: (1) the physicians announcing that they would boycott the proposed outpatient center and (2) the Hospital defendants submitting false and misleading information to the Department. Specifically, the Surgical Center alleges that the Hospital defendants informed the Department that its nineteen physicians would not use the Surgical Center facility in the hope that this information would convince the Department that the proposed facility could not meet the statutory requirements for a CON. In addition, the Surgical Center claims that the Hospital defendants sought to mislead the Department into believing that the Hospital intended to open its own outpatient center, which was then under construction, and that this

4

facility would satisfy all of Armstrong County's outpatient surgery needs. The Hospital's partially constructed facility was designed to provide alternative space for outpatient surgeries then conducted in three of the Hospital's six mixed-use operating rooms. According to the Surgical Center, however, the Hospital defendants knew that the construction of the Hospital's facility had been stopped with only the shell of the building completed and that the Hospital had made no commitment to resume construction. Despite this knowledge, it is alleged that the Hospital defendants falsely represented to the Department that its new center was either in use or very near completion.

The Department denied the Surgical Center's CON application. The Surgical Center appealed that decision to the Commonwealth of Pennsylvania State Health Facility Hearing Board, which conducted its own hearing and received additional evidence.[1] The Board affirmed the Department's decision after finding that (1) the Surgical Center's facility would result in needless duplication of existing facilities and health care services, and (2) the Surgical Center would not be economically viable because the nineteen Hospital surgeons who performed ninety percent of Armstrong County's surgeries would not use the Surgical Center facility. According to the Board, "the most damaging evidence [against the Surgical Center's application] is that the number of physicians who might have been expected to support the facility decreased significantly after the Applicant had submitted its projections." The Surgical Center appealed the Board's decision to the Commonwealth Court of Pennsylvania, which affirmed the Board's decision.

The Surgical Center filed this antitrust action seeking treble damages for, inter alia, denial of the CON, lost value of the CON and the proposed outpatient center, and lost profits. It contends that the Hospital defendants' conspiracy

_____

1. The Act of Feb. 23, 1996, P.L. 27, 1996 Pa. Laws 10, S 9(a) (repealing Pa. Stat. Ann. tit. 35, SS 448.501-448.507), has since eliminated the Health Facility Hearing Board and transferred its review functions to the Health Care Policy Board. This change does not affect our review of the Surgical Center's appeal.

5

caused the Department to deny its CON application. The District Court dismissed the Surgical Center's suit for failure to state a claim upon which relief may be granted, see Fed. R. Civ. P. 12(b)(6), holding that the Hospital defendants' conduct was immune from antitrust scrutiny.

III.

We begin by considering the Surgical Center's claim that the Hospital defendants conspired to boycott its outpatient center, thereby violating sections 1 and 2 of the Sherman Act. To state a claim under section 1, a plaintiff must allege "a contract, combination or conspiracy; a restraint of trade; and an effect on interstate commerce." Fuentes v. South Hills Cardiology, 946 F.2d 196, 201 (3d Cir. 1991). Section 2 of the Sherman Act prohibits both monopolies and attempts to monopolize. See 15 U.S.C. S 2. A claim under section 2 must allege "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S. Ct. 884, 890-91 (1993); see also Schuylkill Energy Resources, 113 F.3d at 413.

"A classic boycott involves concerted action with a purpose either to exclude a person or group from the market, or to accomplish some other anticompetitive object, or both." Fuentes, 946 F.2d at 202 (internal quotes omitted); see also St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 541, 98 S. Ct. 2923, 2929-30 (1978). Such commercially motivated group boycotts, or concerted refusals to deal, generally are considered illegal per se under section 1. See F.T.C. v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 431-32, 110 S. Ct. 768, 779-80 (1990); Weiss v. York Hospital, 745 F.2d 786, 818 (3d Cir. 1984). When a boycott's aim is to monopolize trade, it might also violate section 2. See Retina Associates v. Southern Baptist Hosp. of Fla., Inc., 105 F.3d 1376, 1384 (11th Cir. 1997).

The Hospital defendants do not deny that the complaint alleges a threat of a boycott that might under other

6

circumstances constitute an antitrust violation. They insist, however, that the complaint alleges facts establishing that they are immune from antitrust liability. Specifically, they contend that their activities are insulated from antitrust scrutiny because their allegedly wrongful conduct occurred in the context of supplying information to the Pennsylvania Department of Health during the Surgical Center's CON application process and because the injuries alleged resulted solely from the Department's denial of the CON.

In Parker v. Brown, 317 U.S. 341 (1943), an agricultural producer challenged a marketing program adopted by California's Director of Agriculture as invalid under the Sherman Act. The program served to restrict competition among growers and maintain prices in commodity distribution. "Relying on principles of federalism and state sovereignty, [the Supreme Court] held that the Sherman Act did not apply to anticompetitive restraints imposed by the States `as an act of government.' " City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365 (1991).

In Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961), and United Mine Workers v. Pennington, 381 U.S. 657 (1965), the Supreme Court held that antitrust liability cannot be predicated solely on petitioning to secure government action even where those efforts are intended to eliminate competition. As the Court explained in Noerr, "[t]he right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend on their interest in doing so." Noerr, 365 U.S. at 139.

The Parker doctrine and the Noerr-Pennington doctrine have been interpreted as complementing each other to protect the two related but distinct principles upon which they are founded. As the Supreme Court has more recently observed:

> Parker and Noerr are complementary expressions of the principle that the antitrust laws regulate business, not politics; the former decision protects the States' acts of governing, and the latter the citizens' participation in government.

7

Omni, 499 U.S. at 383.

As the Surgical Center emphasizes, however, the immunity afforded to a private party under Noerr is not unlimited. Where the challenged private conduct is only "sham" petitioning -- i.e., where it "is not genuinely aimed at procuring favorable government action as opposed to a valid effort to influence government action"-- Noerr immunity is not available. Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc. 508 U.S. 49 (1993) ("PRE"). In essence, sham petitioning entails "the use of the governmental process -- as opposed to the outcome of that process -- as an anticompetitive weapon." PRE, 508 U.S. at 61 (emphasis added). Accordingly, the sham petitioning exception does not apply in a case like the one before us where the plaintiff has not alleged that the petitioning conduct was for any purpose other than obtaining favorable government action.2

_____

2. Plaintiff 's allegations that both the threatened boycott and the claimed misrepresentations were intended to secure denial of the CON distinguish the situation before us from cases like Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119 (3d Cir. 1999), that deal with the "sham" exception to the Noerr doctrine. In Cheminor, the defendant, Ethyl, had petitioned the International Trade Commission and the Department of Commerce, alleging that Cheminor was dumping bulk ibuprofin on the U.S. market and seeking the imposition of extra duties to offset the alleged subsidies that enabled it to do so. Although Cheminor withdrew from the U.S. market prior to a final decision on Ethyl's petition, it alleged injuries resulting from the petition and brought an antitrust suit against Ethyl. In response to Ethyl's reliance on Noerr immunity, Cheminor asserted that the petition was a "sham" and Noerr immunity thus was unavailable. We analyzed and rejected Cheminor's argument under the teachings of PRE.

PRE holds that Noerr immunity is lost when the petition is a "sham," i.e., "is not genuinely aimed at procuring favorable government action." PRE, 508 U.S. at 58. As we noted in Cheminor, PRE further holds that determining whether a petition is a sham requires a two-step process. First, the Court determines whether the petition is "objectively baseless;" if not, the petition is not a sham without regard to the subjective intent of the petitioner. Second, if the petition is objectively baseless (and only if it is objectively baseless), the Court is to look to the petitioner's "subjective motivation" and determine "whether the baseless [petition] conceals an attempt to interfere directly with the business relationships

8

It is also true that a private party can be held liable even for bona-fide petitioning conduct where that conduct has caused direct antitrust injury in the market place. F.T.C. v. Superior Court Trial Lawyers Ass'n., 493 U.S. 411 (1990). In Trial Lawyers, for example, the public defenders of the District of Columbia engaged in a concerted refusal to represent indigent defendants in order to pressure the District into raising the hourly rate paid. The Court held that the defendants could be held liable under the Sherman Act for injuries that resulted directly from the boycott, even though the boycott was intended to secure government action.

The limitation on Noerr immunity recognized in Trial Lawyers is inapplicable, however, to a case where the sole antitrust injury is caused directly by the government action that the private defendant has helped to secure. Thus, even where the same petitioning conduct might give rise to antitrust liability for injury directly caused to a competitor in the marketplace, if relief is sought solely for injury as to which the state would enjoy immunity under Parker, the

_____

of a competitor through the use of governmental process -- as opposed to the outcome of that process -- as an anticompetition weapon." 508 U.S. at 60-61 (emphasis in original) (quoting Noerr, 365 U.S. at 144, and Omni, 499 U.S. at 380).

Cheminor holds that where the petitioning effort allegedly involves misrepresentations, the Court, at the first step, must "determine whether [the] petition was objectively baseless under[PRE] without regard to those facts that the [plaintiff] alleges [the petitioner] misrepresented." Cheminor, 168 F.3d at 123 (emphasis in original). Such a determination is unnecessary here, however, because the plaintiff affirmatively alleges that defendants' purpose was to secure the outcome of the process -- denial of the CON. Thus, even if defendants' opposition to the CON were found to be objectively baseless (a conclusion that could not be reached on this record), defendants would pass the second, "subjective" test and the sham exception to Noerr immunity would be inapplicable here.

While Cheminor focuses on the sham exception to Noerr immunity, it also rejects Cheminor's more general argument that "Noerr-Pennington immunity does not apply at all to petitions containing misrepresentations." Id. To that extent, it supports the conclusion reached below with respect to the misrepresentation claim.

9

private petitioner also enjoys immunity. As the Supreme Court explained in Allied Tube & Conduit Corp. v. Indian Head, Inc.:

> Concerted efforts to restrain or monopolize trade by petitioning government officials are protected from antitrust liability under the doctrine established by [Noerr; Pennington, and California Motor Transport Co. v. Trucking Unlimited]. The scope of this protection depends, however, on the source, context, and nature of the anticompetitive restraint at issue. "[W]here a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action," those urging the governmental action enjoy absolute immunity from antitrust liability for the anticompetitive restraint.

486 U.S. 492, 499 (1987) (citations omitted) (quoting Noerr, 365 U.S. at 136).

We applied this principle in Mass. School of Law at Andover, Inc. v. American Bar Assoc., 107 F.3d 1026 (1997) ("MSL"). There, the plaintiff, an unaccredited law school, complained of injuries resulting from the fact that, without ABA accreditation, the school's graduates were refused admittance to most states' bar examinations. We identified the critical issue as "whether state or private conduct caused the injury MSL alleges it suffered." Id. at 1035. Looking to the source of the restraint-causing injury, we found that because "every state retains the final authority to set all the bar admission rules," any injury the plaintiff suffered "is the result of state action and thus immune." Id. at 1035–36.

This reasoning was similarly applied in Sandy River Nursing Care v. Aetna Casualty, 985 F.2d 1138, 1147 (1st Cir. 1993), where the defendant insurers allegedly employed a boycott in an effort to force the legislature to enact legislation permitting rate increases. Because all the plaintiff 's claimed injuries were associated with increased rates charged by the defendants after the legislature removed the rate limits, the court concluded that "[plaintiff's injuries] must be viewed as a product of state action" and that the defendants were, accordingly, immune from liability.

Here, looking to the source of the complained of injuries, we find that all of the Surgical Center's alleged injuries arise solely from the denial of the CON: the denial of the ability to operate the proposed facility; the loss of the CON's value, the value of the facility, and the value of the operation's proceeds; the delay in securing the CON; and "other related losses." Each of the injuries the plaintiff claims is a direct result of the Department's decision to deny the plaintiff's application for a CON.3

In sum, where, as here, all of the plaintiff 's alleged injuries result from state action, antitrust liability cannot be imposed on a private party who induced the state action by means of concerted anticompetitive activity. It follows that the complaint fails to state a boycott claim upon which relief can be granted. See Noerr, 365 U.S. at 136; Parker, 317 U.S. at 352.

IV.

The Surgical Center's second claim is that the Hospital defendants, as a part of their conspiracy, misled the Department, the Board, and the Commonwealth Court into believing that the Hospital's partially constructed facility would soon open and meet the needs of the relevant market when the Hospital defendants knew that the facility would not be completed. The resulting injury, it is said, was the denial of the Surgical Center's application for a CON. The Center would have us deny antitrust immunity to the Hospital defendants on the grounds that they successfully opposed the issuance of a CON using information known to be false.

Although the Supreme Court suggested in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 512–13 (1972), that petitioning activity involving knowingly

_____

3. While plaintiff also claims "increased costs, legal and otherwise, in pursuing Plaintiff's application for a CON," the referenced costs apparently relate to the appeal plaintiff prosecuted from the Board's decision. Plaintiff does not contend that it incurred costs at the Board level in excess of the cost it would have incurred had the threat of a boycott (or the alleged misrepresentations) not been made.

11

false information submitted to an adjudicative tribunal might not enjoy antitrust immunity, the Court has never so held. See PRE, 508 U.S. at 61 n.6 (suggesting that the issues of whether there is a misrepresentation exception to Noerr and, if so, the extent thereof, remain open). Moreover, since California Motor, the Supreme Court has decided a case that casts doubt on whether such an exception exists under any circumstances and dictates that, in the circumstances of this case, we honor the Hospital defendants' claim to immunity.

In Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365 (1991), Columbia Outdoor Advertising, Inc. ("COA") controlled 95 percent of the billboard rental business in Columbia, South Carolina. According to respondent Omni Outdoor Advertising, Inc. ("Omni"), a newcomer to the market, COA and city officials conspired to restrain competition in the market through adoption of a zoning ordinance limiting the size, spacing, and location of billboards in the city. Omni filed suit against the city and COA alleging a violation of the Sherman Act. A jury found the existence of a conspiracy between the city and COA, and both were held liable for Omni's injuries despite their insistence that they were entitled to antitrust immunity under Parker and Noerr, respectively.

The Court first concluded that Omni's alleged injury was the result of state action. South Carolina had authorized its municipalities to regulate land use and construction and, in doing so, had provided a "clear articulation of state policy to authorize anticompetitive conduct by the municipality in connection with its regulation." Omni, 499 U.S. at 372 (quoting Town of Hallie v. City of Eau Claire, 471 U.S. 34, 40 (1985)). As the Court explained:

> The very purpose of zoning regulation is to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants. A municipal ordinance restricting the size, location, and spacing of billboards (surely a common form of zoning) necessarily protects existing billboards against some competition from newcomers.

12

Id. at 373 (footnote omitted).

Having thus concluded that "the city's restriction of billboard construction was prima facie entitled to Parker immunity," id. at 374, the Court turned to the issue of whether the existence of a conspiracy between city officials and COA had stripped the city of that immunity. It first noted the foundation of Parker immunity:

> The rationale of Parker was that, in light of our national commitment to federalism, the general language of the Sherman Act should not be interpreted to prohibit anticompetitive actions by the States in their governmental capacities as sovereign regulators.

Id. It then observed that if conspiracy was taken to mean "nothing more than an agreement to impose the regulation in question," the purpose of Parker immunity would be defeated because "it is both inevitable and desirable that public officials often agree to do what one or another group of private citizens urges upon them." Id. at 375.

Because the jury had been instructed that a conspiracy was "an agreement . . . to accomplish an otherwise lawful result in an unlawful manner," id. at 376 n.5, the Court next considered whether Parker immunity is lost when it is shown that an agreement between the defendants involved governmental corruption, bribery, or other violations of state or federal law. It held that Parker immunity remains in such circumstances. The Court found "impractical" the contention that Parker immunity is forfeited by governmental corruption, "defined variously as `abandonment of public responsibilities to private interests,' . . . `corrupt or bad faith decisions,' . . . and `selfish or corrupt motives.' " Id. at 376. Such a rule would call upon antitrust courts to speculate as to whether state action purportedly taken in the public interest was the product of an honest judgment or desire for private gain. The Court stressed that Parker "was not meant to shift [judgments about the public interest] from elected officials to judges and juries." Id. at 377.

With respect to the contention that Parker immunity should be forfeited at least where bribery or other illegal activity may have subverted the state decision making

process, the Court observed that this approach had "the virtue of practicality but the vice of being unrelated to" the purposes of the Sherman Act and Parker. Id. at 378. It chose to rely on sanctions other than the Sherman Act to discourage such behavior:

> To use unlawful political influence as the test of legality of state regulation undoubtedly vindicates (in a rather blunt way) principles of good government. But the statute we are construing is not directed to that end. Congress has passed other laws aimed at combating corruption in state and local governments.

Id. at 378-79.

For these reasons, the Court rejected "any interpretation of the Sherman Act that would allow plaintiffs to look behind the actions of state sovereigns to base their claims on [charges that the state's decision making process was corrupted by bribery or other unlawful activity]." Id. at 379. It concluded its discussion of the city's immunity by "reiterat[ing] that, with the possible market participant exception,[4] any action that qualifies as state action is `ipso facto . . . exempt from the operation of the antitrust laws.' " Id. at 379 (emphasis in original) (quoting Hoover v. Ronwin, 466 U.S. 558, 568 (1984)).

Turning to the liability of Omni, the Court addressed whether Noerr's immunity for private parties was subject to any of the exceptions that had been urged in the context of Parker immunity.[5] It declined to restrict Noerr immunity in this way for the same reason it had declined to so restrict Parker immunity:

> Insofar as the identification of an immunity-destroying "conspiracy" is concerned, Parker and Noerr generally

_____

4. The referenced possible exception relates to state action as a purchaser or seller in the market rather than as a sovereign regulator.

5. The Court first concluded that the "sham" exception to Noerr immunity was inapplicable because that exception"encompasses situations in which persons use the governmental process -- as opposed to the outcome of that process -- as an anticompetitive weapon." Id. at 380. COA had sought to use only the outcome of the process to suppress competition.

14

present two faces of the same coin. . . . The same factors which, as we have described above, make it impracticable or beyond the purpose of the antitrust laws to identify and invalidate lawmaking that has been infected by selfishly motivated agreement with private interests likewise make it impracticable or beyond that scope to identify and invalidate lobbying that has produced selfishly motivated agreement with public officials. "It would be unlikely that any effort to influence legislative action could succeed unless one or more members of the legislative body became . . .`co-conspirators' " in some sense with the private party urging such action. And if the invalidating"conspiracy" is limited to one that involves some element of unlawfulness (beyond mere anticompetitive motivation), the invalidation would have nothing to do with the policies of the antitrust laws. In Noerr itself, where the private party "deliberately deceived the public and public officials" in its successful lobbying campaign, we said that "deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned. " 365 U.S. at 145.

Id. at 383-84 (emphasis added).

The teachings of Omni are pertinent here. Considerations of federalism require an interpretation of the Sherman Act that forecloses liability predicated on anticompetitive injuries that are inflicted by states acting as regulators. Liability for injuries caused by such state action is precluded even where it is alleged that a private party urging the action did so by bribery, deceit or other wrongful conduct that may have affected the decision making process. The remedy for such conduct rests with laws addressed to it and not with courts looking behind sovereign state action at the behest of antitrust plaintiffs. Federalism requires this result both with respect to state actors and with respect to private parties who have urged the state action.

Here, the Department is authorized by state statute to regulate the number, size, and spacing of health care facilities. Like the statute in Omni, this statute provides a "clear articulation of state policy" which authorizes the

15

Department "to displace unfettered business freedom in a manner that regularly has the effect of preventing normal acts of competition, particularly on the part of new entrants." Id. at 373. While it is true that the challenged decision of the Department involved an individualized application of established criteria, rather than the establishment of criteria as in Omni, the Department's action was every bit as essential to the execution of the sovereign's regulatory policy as was the adoption of the zoning ordinance by the Columbia city council.

The Surgical Center's CON application called upon the Department to determine whether the opening of a new ASC was in the public interest. The Department conducted its own investigation and then held a hearing at which all interested parties had the opportunity to tender evidence and argument. It then made findings and determined that the issuance of the CON was not in the public interest. After a second hearing, that determination was concurred in by the Board, and the Commonwealth Court thereafter concluded that the Board's decision was supported by substantial evidence.

It is not clear to us that the issue of whether the Hospital's new facility would be completed was considered important by the Department or the Board. Neither made an express finding on that issue.6 It is clear from the
_____

6. The Board's "need projection formula" projected a need for 6.5 operating rooms. The Hospital currently had six general purpose operating rooms and a room used for "short procedures" such as endoscopies, colonoscopies and sigmoidoscopies. If and when the Hospital's proposed facility was completed, three of the general purpose operating rooms would be closed and the ambulatory surgical services provided in the main building would be provided in the new facility. The Surgical Center proposed to add two operating rooms under circumstances where the State Health Plan's need–project formula indicated, at most, need for one additional (seventh) operating room. In terms of the population to be served and the surgical services to be rendered, the Surgical Center's project would do little other than raise the number of operating rooms in Armstrong County above the limit set by the State Health Plan. The Board, therefore, concluded that approval of the instant CON application would result in needless duplication of existing facilities and health care services. While the Surgical Center

16

Board's written decision, however, that the Board heard evidence on the issue, knew construction had been halted, and believed "there was credible evidence that the project ha[d] not been abandoned." Board Op. at 14. Thus, to the extent this issue was material, the record reflects that the decision makers recognized that there was a dispute and made a credibility determination concerning it.

On the facts alleged in the complaint, it is also clear that the state decision makers were disinterested, conducted their own investigation, and afforded all interested parties an opportunity to set the record straight. The initial decision was then twice reviewed. Finally, anyone who believed that a fraud was committed on the Department or Board could have moved to reopen the proceeding and attempted to persuade them that they were materially misled. See, e.g., 1 Pa. Code SS 35.231, 35.233 (authorizing a reopening of an administrative proceeding on motion of a participant or by the agency whenever the public interest requires). As matters currently stand, however, the Department's decision concerning where the public interest lies remains in place as the final decision of the Board and the judgment of the Commonwealth Court.

In these circumstances, Omni compels us to affirm the District Court.[7] Indeed, such a result seems to follow, a fortiori, from Omni given the conceded presence here of

_____

projected a higher need and suggested that its facility would serve a larger area than the hospital, the Board found its projections flawed. The opinion of the Commonwealth Court establishes that it also understood this to be the basis for the Board's ruling, a basis for which it found support in the record.

7. We acknowledge that the result we reach is in conflict with the holding of the court in St. Joseph's Hospital v. Hospital Corp. of America, 795 F.2d 948 (11th Cir. 1986) and with the analysis of the courts in Kottle v. Northwest Kidney Centers, 146 F.3d 1056 (9th Cir. 1998) and Potters Medical Center v. City Hospital Ass'n., 800 F.2d 568 (6th Cir. 1986). To the extent of that conflict, we respectfully disagree with the views there expressed. We note that the courts in St. Joseph's Hospital and Potters Medical Center did not have the benefit of the Supreme Court's 1991 decision in Omni and that Kottle's brief analysis does not reference that decision.

17

disinterested decision makers, an independent investigation, an open process, and extensive opportunities for error correction. The risk that the plaintiff 's injury is not the result of a bona fide execution of state policy is far less substantial here than in Omni and there is, accordingly, far less justification for federal court review of the state's policy judgment. For these reasons, we must decline the Surgical Center's invitation to look behind the decisions of the Department, the Board, and the Commonwealth Court. Rather, based on Omni, we are constrained to honor the Hospital defendants' claim to Noerr immunity.8

V.

Accordingly, we will affirm the District Court's order dismissing the Surgical Center's complaint for failure to state a claim upon which relief may be granted.

_____

8. This is not a case like Walker Process Equip., Inc. v. Food Machinery and Chem. Corp., 382 U.S. 172 (1965), or Woods Exploration & Prod. Co., Inc. v. Aluminum Company of America, 438 F.2d 1286 (5th Cir. 1971). In Walker, the state action was the issuance of a patent which allegedly had been procured by fraud. The attempted enforcement of the patent against the plaintiff was held actionable under the Sherman Act. The decision making process there was an ex parte one in which the Patent Office was wholly dependent on the applicant for the facts. While the Patent Office can determine the prior act from its own records, it effectively and necessarily delegates to the applicant the factual determinations underlying the issuance of a patent. Accordingly, when the applicant has submitted false factual information, the state action is dependent on financially interested decision making. See Einer Elhauge, Making Sense of Antitrust Petitioning Immunity, 80 Calif. L. Rev. 1177, 1249 (1992) (suggesting that the immunity exception recognized in Walker is "very narrow" and applies only when financially interested parties essentially made the factual determinations that triggered the governmental restraint). The same is true of the situation in Woods where the Texas Railroad Commission was wholly dependent on the antitrust defendants for the factual information on which it predicated its allocation of production from a given field.

18

SCHWARTZ, Senior District Judge, Dissenting:

With its decision today, the majority holds private parties who make misrepresentations that pervasively influence the decision making process of public entities are entitled to immunity under both the state action immunity doctrine and the Noerr–Pennington immunity doctrine. The majority opinion conflicts with the teaching of this Court in an opinion issued less than four months ago, which held that under certain circumstances applicable here, material misrepresentations that affect the core of a litigant's submissions to an administrative body are not entitled to Noerr–Pennington immunity. See Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119 (3d Cir. 1999).

I respectfully dissent for three reasons. First, I believe the misrepresentation exception to the Noerr–Pennington doctrine should be applied when intentional falsehoods pervade the entire state administrative proceeding leading to the denial of plaintiff 's application for a certificate of need ("CON"). Second, the majority's position that the misrepresentation exception has no place in the jurisprudence of this Circuit is not supported by case law. Finally, the majority relies on a Supreme Court decision that is not applicable to this case. As a consequence, the defendant should not be able to escape liability for its misrepresentations under either the state action or Noerr–Pennington immunity doctrines.

According to the majority opinion, the defendants are immune from antitrust liability for their conduct during the course of petitioning the Pennsylvania State Health Facility Hearing Board ("Board") to deny plaintiff 's application for a CON. The majority opinion finds City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365 (1991), supports the dismissal of plaintiff's claim. First, the majority finds that the District Court properly dismissed the boycott and misrepresentation claims under the Noerr–Pennington doctrine. The majority believes that Omni and Cheminor Drugs cast doubt on whether a misrepresentation exception to Noerr–Pennington immunity exists under any circumstances. Further, even if a misrepresentation exception exists, the majority asserts that the alleged misrepresentations were irrelevant because the Board

19

denied the CON on grounds independent of the misrepresentations. The majority emphasizes that the decision makers were disinterested, conducted an independent investigation, and the process afforded opportunities for error correction. In summary, the majority has essentially found the denial of the CON was untainted by the alleged misrepresentations or boycott threats.

Second, the majority decision argues it was not the boycott or misrepresentation, but rather the denial of the CON that was the direct cause of the Surgical Center's alleged injuries. The majority concludes denial of the CON was state action and the Hospital parties are therefore immunized from antitrust liability under state action immunity, arguing that "[l]iability for injuries caused by such state action is precluded even where it is alleged that a private party urging the action did so by . . . wrongful conduct that may have affected the decision making process." [Majority opinion at page 15]. Given the procedural posture of a motion to dismiss, I believe the majority's conclusion is not only impermissible fact-finding, but also contrary to the Surgical Center's entitlement to all favorable inferences and resolution of factual disputes in its favor.1

DISCUSSION

I. The Hospital Parties' Actions

Armstrong Surgical Center asserts the Hospital parties conspired to subvert the establishment of its facility by

_____

1. In ruling on a motion to dismiss, the court must accept the well-pleaded facts as true and resolve them in the light most favorable to the plaintiff. Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998); Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). In addition, the court may consider allegations contained in the complaint, exhibits attached to the complaint, and matters of public record. See City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 259 (1998); Steinhardt Group, Inc. v. Citicorp, 126 F.3d 144, 145 (3d Cir. 1997). Accordingly, this dissent, like the majority, considers both the Board's decision and the Commonwealth Court decision.

20

announcing to the Board, which was reviewing the Surgical Center's CON application, their intent to boycott the facility, and by submitting false and misleading information to the Board regarding the Hospital's ASC. The purpose of the boycott and misrepresentations was to eliminate a potential new entrant whose competition would adversely affect all the defendants. The Hospital has a complete area monopoly in providing operating room services. The nineteen physicians who sent boycott letters performed nearly 90% of all surgery in the relevant geographic area. Thus, the Hospital parties' actions targeted two criteria the Board considers in reviewing a CON application: (1) the need for the facility, and (2) its prospective economic viability.

The nineteen physicians in question sent letters to the Board, as it was considering the CON application, stating they would not use the plaintiff's ASC, but would only use the (fictional) ASC provided by the Hospital. The letters stated:

> I do not intend to perform surgery at the proposed Armstrong Surgical Center. I intend to use the services of the Ambulatory Surgery Center at Armstrong County Memorial Hospital. The hospital's Ambulatory Surgical Center provides the highest quality medical care at the most reasonable cost.

The letters go on to suggest that since the Hospital's ASC is superior, the proposed ASC is unnecessary: "It duplicates services already being provided, and it is not cost effective." All nineteen letters submitted to the Board were on the Hospital stationery, and contained the same language.

The Pennsylvania Department of Health ("Department") disapproved plaintiff's CON application on November 23, 1993. The Board affirmed the Department's decision on March 13, 1996. The Board relied on two grounds for affirming the denial of the CON: (1) the Board found the Hospital ASC made Armstrong's ASC duplicative and unnecessary, and (2) Armstrong's ASC would not be economically viable because 90% of the staff physicians would not use it.

The Hospital misrepresented to the Board that its ASC was substantially built and would be ready for use in the

21

near future. When the Hospital parties made their misrepresentations, they knew the Hospital had ceased construction of its outpatient facility months before the hearing, and that construction had not resumed. The fact that the Department learned that this representation was false before it denied the CON does not detract from the falsity of the representation. The Department and the Board learned construction on the Hospital ASC had been interrupted, but they did not know the Hospital had no intent to build or operate a Hospital ASC. In fact, the Board opinion demonstrates the opposite was true. Although the Board knew the Hospital was using the building as a storage facility, it was led to believe that the Hospital had not abandoned the project. Further, because it was not in its economic interest, the Hospital did not plan to resume construction if Armstrong's CON application was denied. The Board's decision relied on the misrepresentation that the Hospital ASC was or would be built and the threat of a boycott.

Armstrong's ASC would not be economically viable because the nineteen physicians who performed nearly all surgeries in the area would not use the new facility if completed because they would use the Hospital ASC. The Board noted the effect of the boycott letters sent by the physicians in explaining its denial of Armstrong's CON application:

> [T]he most damaging evidence is that the number of physicians who might have been expected to support the facility decreased significantly after the Applicant had submitted its projections. . . . The nineteen physicians who opposed the project in writing are responsible for approximately 90 percent of all surgery performed at the Hospital and each is on the Hospital's staff.
>
> In other words, after the application was submitted (and for whatever reason) support for the facility eroded among physicians who either had supported it initially or were being counted upon for their eventual participation. Because the Applicant would therefore have to generate much of its volume from outside the service area or from patients who reside in the service

22

area but currently "migrate" to other locales for ambulatory surgery, we seriously doubt that the volume projections made for the facility can be achieved.

Board Op. at 47-48 (citations and footnote omitted).

With these facts in mind, I turn to the majority conclusion that the Hospital parties have immunity for the injuries resulting from their misrepresentations.

II. Applicability of the Noerr-Pennington Doctrine

The Hospital parties contend the Noerr-Pennington immunity doctrine applies because their announced intentions not to perform operations at Armstrong's ASC facility and statements regarding the existence of the Hospital ASC came in the context of supplying information to state agencies. In general, the Noerr-Pennington doctrine immunizes concerted efforts to restrain or monopolize trade when petitioning the government. Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); see Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc. ("PRE"), 508 U.S. 49 (1993). The purpose or motive in petitioning government officials is irrelevant; the fact that the sole purpose might be to destroy a competitor does not undermine the protection afforded by the immunity. Noerr, 365 U.S. at 139. This is true even if "some direct injury" is an "incidental effect" of legitimate petitioning activity, regardless of whether the petitioner is aware of the infliction of such injury. Id. at 143-144.[2]

_____

2. The Court in Noerr stated:

It is inevitable, whenever an attempt is made to influence legislation
by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed. And it seems equally inevitable that those conducting the campaign would be aware of, and possibly even pleased by, the prospect of such injury. To hold that the knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to outlawing all such campaigns.

23

If the physicians had simply expressed their opposition to the proposed facility without intentionally misleading administrative decision makers about their intent to use the uncompleted Hospital ASC, the Noerr-Pennington doctrine would protect their statements. Similarly, if the Hospital had not informed the administrative decision makers it was going to build and operate a Hospital ASC, or if it had informed the decision makers it originally intended to build and operate a Hospital ASC but had concluded it would no longer do so, Noerr-Pennington immunity would be available to them. However, as set forth above and in the majority opinion, that is not what occurred.

A. Courts Have Distinguished Between Misrepresentations Made In The Political Context As Opposed to the Administrative or Adjudicative Context

The majority's reliance on City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365 (1991), for the proposition that there is no misrepresentation exception to Noerr-Pennington immunity is misplaced. In Omni, one defendant sought to persuade the city of Columbia to create zoning ordinances, which had a detrimental effect on the plaintiff, who was a competitor of that defendant. The Supreme Court held that the defendant was not liable for antitrust violations for statements made to the city. 499 U.S. at 382. Omni reaffirmed that deliberate misrepresentations in the legislative arena, "reprehensible as [they are], can be of no consequence so far as the Sherman Act is concerned." Id. at 384. The majority's reliance on Omni is not persuasive because here, the setting is an adjudicatory arena, not a lobbying or legislative one as in Omni.

The majority cites Omni for the proposition that there is no misrepresentation exception. PRE, which was decided two years after Omni, suggests that the issue of whether there is a misrepresentation exception to Noerr-Pennington remains an open question. 508 U.S. at 61 n.6. While PRE cited California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 512-13 (1972), with approval, the Supreme Court in PRE declined to decide whether Noerr permits

24

antitrust liability for a litigant's fraud or other misrepresentations. 508 U.S. at 61 n.6.

The Supreme Court has stated, not once, but twice, that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." California Motor Transp., 404 U.S. at 513. Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 499-500 (1988), stated that unethical and deceptive practices in "less political arenas," such as administrative or adjudicatory settings, could violate antitrust laws. Thus, the Supreme Court has broadly hinted Noerr-Pennington immunity is not intended to shield petitioning activities that do not further, but rather distort, the decision-making process in the non-legislative context.

Several Circuit Courts of Appeal also have distinguished between the level of immunity afforded to misrepresentations made in different forums. In Potters Medical Center v. City Hospital Ass'n, 800 F.2d 568, 571 (6th Cir. 1986), the plaintiff alleged that the defendant hospital's certificate of need application contained materially false statements about the plaintiff. The court stated that "the knowing and willful submission of false facts to a government agency falls within the sham exception to the Noerr-Pennington doctrine." Id. at 580. The Fifth Circuit in Woods Exploration & Producing Co. v. Aluminum Co. of America, 438 F.2d 1286, 1296-98 (5th Cir. 1971), cert. denied, 404 U.S. 1047 (1972), held that Noerr did not protect, inter alia, the filing of false production forecasts with a state regulatory commission. The court stated that the Noerr-Pennington doctrine seeks to protect attempts to influence policies and held that "the abuse of the administrative process here alleged does not justify antitrust immunity." Id. at 1298.

Other cases have held the Noerr-Pennington doctrine does not immunize misrepresentations made in the administrative or adjudicative context. See, e.g., Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 124 (3d Cir. 1999) (holding that material misrepresentations in an adjudicative arena are not protected by Noerr-Pennington immunity); Whelan v. Abell, 48 F.3d 1247, 1255 (D.C. Cir. 1995) (finding that if sham claim involves administrative agencies,

25

then Noerr does not protect "petitions based on known falsehoods"); St. Joseph's Hosp., Inc. v. Hospital Corp. of Am., 795 F.2d 948, 955, reh'g denied en banc , 801 F.2d 404 (11th Cir. 1986), see infra; Ottensmeyer v. Chesapeake & Potomac Tel. Co., 756 F.2d 986, 994 (4th Cir. 1985) (suggesting that knowing submission of false information to police -- communications which "do not constitute the type of `political activity' protected by the Noerr-Pennington doctrine" -- would fall within the sham exception); Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1261 (9th Cir. 1982) (stating that Noerr does not immunize false information given to an administrative or adjudicatory body), cert. denied, 459 U.S. 1227 (1983); Israel v. Baxter Labs., Inc., 466 F.2d 272, 278 (D.C. Cir. 1972) ("No actions [efforts to deceive the Food and Drug Administration] which impair the fair and impartial functioning of an administrative agency should be able to hide behind the cloak of an antitrust exemption.").

The rationale for limiting immunity for private actors' efforts to mislead adjudicatory or administrative officials is that these entities, as compared to legislative bodies, rely on information supplied by the parties to a greater extent than legislative bodies. Allied Tube, 486 U.S. at 499-500. The Ninth Circuit in Clipper Exxpress, 690 F.2d at 1261, explained:

> There is an emphasis on debate in the political sphere, which could accommodate false statements and reveal their falsity. In the adjudicatory sphere, however, information supplied by the parties is relied on as accurate for decision making and dispute resolving. The supplying of fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve immunity from the antitrust laws.

The majority recognizes the decision by the Department to deny the CON involved an individualized application of established criteria. However, it attempts to reconcile the difference between the adjudicative context and legislative context by arguing that the Department's decision to deny the certificate of need was "essential to the execution of the sovereign's regulatory policy" regarding health care facilities. [Majority opinion at page 16]. This distinction is

26

unpersuasive. Although the government agency's decision on the certificate of need application could be viewed as essential to regulating health care facilities, St. Joseph's Hospital, 795 F.2d at 955, and Kottle v. Northwest Kidney Centers, 146 F.3d. 1056, 1063 (9th Cir. 1998), cert. denied, 119 S.Ct. 1031 (1999), both held that misrepresentations in this context do not have Noerr immunity. Every adjudicative decision could be viewed as essential to a sovereign's regulatory policy and thus, the majority would nullify the distinction the Supreme Court and other appellate courts have made between misrepresentations made in the legislative context as opposed to the administrative or adjudicative context.

The majority appears to argue that the process employed by the Department could uncover misrepresentations because the Department conducted its own investigation. However, in Cheminor, the governmental bodies -- the Department of Commerce ("DOC") and the International Trade Commission ("ITC") -- also conducted their own investigation, but another panel of this Court still held material misrepresentations that affect the core of the defendant's petition will preclude Noerr-Pennington immunity. 168 F.3d at 121, 124 (stating that the "DOC and ITC make final determinations after they have conducted their own investigations . . . and after they have heard further arguments from the parties involved"); see Clipper Exxpress, 690 F.2d at 1261-62 (stating that submitting false information in an adjudicatory proceeding can be the basis for antitrust liability even if the agency was not misled by the information). The majority's view, carried to its logical extreme, would allow the more skillful liar to avoid antitrust liability so long as the decision maker conducts its own investigation.

Moreover, it is not clear the Department conducted an independent investigation. Rather, the Department relied on the Hospital defendants to give truthful information so that it could make a fully informed decision. The majority's opinion recognizes the Board was misled because the Board "made a credibility determination" "that the project ha[d] not been abandoned." [Majority opinion at page 17]. However, the majority refuses to acknowledge that the

27

Board opinion demonstrates that the denial of the CON was based on the false belief, nurtured by the Hospital defendants, that the Hospital would build its ASC.

B. Similar Cases Have Held That Misrepresentations Relating to a CON Application Do Not Enjoy Noerr Immunity

The facts in St. Joseph's Hospital closely parallel those alleged by the plaintiff. The defendant, Memorial Medical Center ("MMC"), was the sole provider of cardiac surgery services in the relevant market area. 795 F.2d at 952. It opposed St. Joseph's CON application, claiming it already had the capacity to perform more heart procedures in the region than required, thus making its competitor's services unnecessary. Id. The Board relied upon this information in denying St. Joseph's request for a CON. Id. St. Joseph's sued, asserting MMC provided false information to the Board. Id. at 953. The court found that the misrepresentations were not made in the political arena and held that parties furnishing false information to a government agency passing on specific certificate applications are not entitled to Noerr-Pennington petitioning immunity. The court held:

> When a governmental agency such as [the State Health Planning Agency] is passing on specific certificate applications it is acting judicially. Misrepresentations under these circumstances do no not enjoy Noerr immunity.

Id. at 955. Accordingly, the court reversed the district court's decision granting the defendant's motion to dismiss. Id. at 957.

The Ninth Circuit, like the Eleventh Circuit in St. Joseph's Hospital, also held Noerr-Pennington immunity does not protect a party's intentional misrepresentations in similar circumstances. Kottle v. Northwest Kidney Centers, 146 F.3d. 1056 (9th Cir. 1998), cert. denied, 119 S.Ct. 1031 (1999). As in this case, the district court in Kottle granted the defendant's motion to dismiss. Id. at 1058-59. The Kottle court also examined allegedly false information relating to a CON application. Id. at 1058. The court stated that if misrepresentations made by a defendant were of

28

such magnitude that the "entire CON proceeding was deprived of its legitimacy," then the sham exception to Noerr-Pennington immunity would apply. Id. at 1063.

The misrepresentations in Kottle were made in an administrative or adjudicatory arena because the Department of Health, the decision maker, conducted public hearings, accepted written and oral arguments, permitted representation by counsel, issued written findings, and its decision was appealable. Id. at 1062. In this case, the Department also conducted public hearings, accepted evidence and argument from interested parties, made findings, and its decision was appealable. Since the court in Kottle found that the misrepresentations were not made in the political or lobbying context, the court applied a different standard than the one set forth in Omni. Id. (stating that "intentional misrepresentation to government officials" is treated differently "outside of the political realm"). The court found, however, that the plaintiff 's complaint fell short of invoking the sham exception because the plaintiff 's vague allegations of misrepresentation were insufficient to overcome the defendant's Noerr-Pennington immunity. Id. at 1064. The court could not ascertain "what representations [the defendant] made, or to whom; with whom [the defendant] conspired . . . or what other testimony the Department may have had that could have influenced its decision to deny [plaintiff]'s CON application." Id. In contrast, the plaintiff 's complaint in this case details the alleged misrepresentations made by the defendants, and the Board decision demonstrates that such material misrepresentations influenced its decision, as well as that of the Commonwealth Court. See infra.

C. The Defendants' Actions Nullify Their Noerr-Pennington Immunity

Our recent decision in Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119 (3d Cir. 1999), does not support the majority's position. In Cheminor, the defendant Ethyl Corporation complained to the ITC and the DOC that plaintiff Cheminor was dumping and selling ibuprofen at less than fair value. Id. at 120. Cheminor brought antitrust claims in which it alleged that Ethyl's statements to the ITC were baseless, made in bad faith, contained false

29

statements, and were brought only for anti-competitive reasons. Id. The issue decided by this Court was whether alleged misrepresentations by Ethyl vitiated its Noerr-Pennington immunity. The Court in Cheminor found the alleged misrepresentations were neither material, nor affected the core of the defendant's petition because the misrepresentations relating to the defendant's profitability were "only a small proportion of the numerous factors the ITC must consider when making a determination of material injury." Id. at 126. Therefore, we affirmed the decision to grant summary judgment in favor of Ethyl because Cheminor did not satisfy the first step of PRE's sham exception to the Noerr-Pennington doctrine. Id. at 127.

Cheminor held material misrepresentations that "infect the core" of the defendant's claim and the government's resulting actions are not entitled to Noerr-Pennington immunity under the "objectively baseless" prong of PRE. Id. at 123. Cheminor requires evaluation of misrepresentations in determining whether a defendant is entitled to Noerr-Pennington immunity. The majority relies on the following language in Cheminor to assert Cheminor stands for the proposition that this Circuit has held the misrepresentation exception is not part of its jurisprudence.

> We decline to carve out a new exception to the broad immunity that Noerr-Pennington provides. Rather, we will determine whether [defendant]'s petition was objectively baseless under the Supreme Court's test in PRE, without regard to those facts that [plaintiff] alleges [defendant] misrepresented.

Id. There are three answers to the majority position. First, it ignores the immediately succeeding sentence in the opinion:

> If the alleged misrepresented facts do not infect the core of Ethyl's claim and the government's resulting actions, then the petition had an objective basis and will receive Noerr-Pennington immunity under the first step of PRE.

Id. I read this language as meaning that prior to determining whether the "petition had an objective basis" the Court must determine "[i]f the alleged misrepresented

30

facts do . . . infect the core of Ethyl's claim." Id. If they do, the misrepresentation exception applies and there can be no "objective basis" for the defendant's position. If, on the other hand, the misrepresentation exception is not applicable, the defendant's petition could well have an objective basis.

Second, the majority has not explained why, if the Cheminor court held there was no misrepresentation exception to the Noerr–Pennington doctrine, it formulated a test for the misrepresentation exception and then painstakingly applied the test analyzing whether the misrepresented facts affected "the core of Ethyl's claim and the government's resulting action. . . ." Id. Third, the court in Cheminor relied on a district court case, Music Center S.N.C. Di Luciano Pisoni & C. v. Prestini Musical Instruments Corp., 874 F. Supp. 543, 549 (E.D.N.Y. 1995). The specific language cited with approval by Cheminor reads:

> [A] determination [of objective basis] requires consideration, inter alia, of . . . the nature of the particular allegations of the petition or actions before the administrative agency claimed to be fraudulent or improper, and whether these claimed misrepresentations or improper actions would have been significant to the ultimate outcome or continuation of the proceeding.

Cheminor, 169 F.3d at 124 (citing Music Center, 874 F. Supp. at 549) (emphasis added). If there were any doubts regarding the court's reliance on Music Center and its approval of the misrepresentation exception to Noerr–Pennington immunity, the Cheminor court set them to rest:

> If the government's action was not dependent upon the misrepresented information, the misrepresented information was not material and did not go to the core of Ethyl's petition. In sum, a material misrepresentation that affects the very core of a litigant's . . . case will preclude Noerr–Pennington immunity, but not every misrepresentation is material to the question of whether a petition such as Ethyl's had an objective basis.

Id. at 124 (second emphasis added and footnote omitted). I am simply unable to accept the majority's reading of Cheminor.

31

Further, the test set forth in Cheminor is applicable here because the alleged misrepresentations in Cheminor were made in the adjudicative context. Omni is not applicable because the alleged misrepresentations in that case were made in a legislative context. In a factually similar case, the 11th Circuit found that "[w]hen a government agency . . . is passing on specific certificate [of need] applications it is acting judicially." St. Joseph's Hospital, 795 F.2d at 955. Misrepresentations made under these circumstances do not enjoy Noerr immunity. Id.

There is a final troubling aspect of the majority's opinion. Assuming this dissent's position is correct that Cheminor recognizes a misrepresentation exception as part of this Circuit's jurisprudence and that the majority holds there is no misrepresentation exception to the Noerr-Pennington immunity doctrine, the majority has done something it cannot do. Under Rule 9.1 of the Internal Operating Procedures of this Court, "no subsequent panel overrules the holding in a published opinion of a previous panel."

      1. The Defendants' Alleged Misrepresentations
      Were Material And Infected The Core Of The
      Defendants' Statements To The Department

The legitimacy of the Board's decision is in question because it relied upon materially false information and was influenced by threats of an illegal boycott. As stated previously, at this stage of the litigation, the plaintiff is entitled to all favorable inferences and resolution of factual disputes in its favor. Therefore, the court must examine whether Armstrong Surgical is entitled, at a minimum, to an inference that the misrepresentations were not only material, but also affected the core of the defendant's claims.

The majority concluded the Board would have denied the CON application regardless of whether the Hospital ASC would be completed. However, the Board's opinion clearly shows that it premised the denial of the CON upon the Hospital's misrepresentation that it would complete and operate a Hospital ASC. In successive Findings of Fact the Board found:

25. The Hospital has partially completed construction of a building on its premises that would house a dedicated outpatient surgical facility.

26. Upon completion of the Hospital's outpatie nt surgical facility, three of its existing operating rooms would be moved into the new building.

27. The proposed ambulatory surgery center and the one which has been partially constructed by the Hospital would serve the same population and would provide essentially the same surgical services.

28. The Applicant's proposed ambulatory surger y center would needlessly duplicate existing facilities and health care services in Armstrong County.

Board Op. at 6 (citations omitted). Taken in context the phrase "needlessly duplicate existing facilities," supra, can only mean that Armstrong's proposed ASC would duplicate the proposed Hospital ASC. In addition, the letters from the 19 physicians stated that the proposed facility duplicated the services already being provided. As previously rehearsed, the Hospital parties knew there was no commitment or intent to complete a functioning Hospital ASC.

Not only the Findings of Fact, but also the Board opinion make clear that the Board, relying upon the misrepresentations of the Hospital parties, premised its denial of the CON and its entire discussion of need-projection upon there being no need for two ASCs-- the Hospital's ASC and Armstrong's ASC:

Although outpatient surgery at the Hospital is now performed in the same operating room as inpatient surgery, the Hospital has partially9 completed construction of a building on its premises to house a dedicated outpatient surgery facility. Upon completing construction, the Hospital would move three existing operating rooms into the new building.

With regard to the population to be served and the surgical services to be offered, there would be little difference between the Applicant's ambulatory surgical center and the one that the Hospital has partially

33

completed, except that the Applicant's project would raise the number of operating rooms in Armstrong County above the limit set by the SHP. We conclude that approval of the instant CON application would result in needless duplication of existing facilities and health care services.

We believe that the factors set forth above, in themselves, are sufficient to support a finding that the Applicant has failed to establish need for the proposed facility by the population to be served. . . .

_____

9. Apparently, after construction of the building and some of the interior walls had been completed, staff physicians at the Hospital began to question whether a separate outpatient facility was necessary. Although the building is currently being used as a storage facility, there was credible evidence that the project has not been abandoned.

Board Op. at 14 (citations omitted). It is noteworthy that the three Commonwealth Court judges, conducting judicial review, were of the belief that the Hospital ASC would be completed:

The hospital has partially completed construction of a building on its premises that would house a dedicated outpatient surgical facility. Upon completion of the hospital's outpatient surgical facility, three of its existing operating rooms would be moved into the new building.

The proposed ambulatory surgery center and the one which has been partially constructed by the hospital would serve the same population and would provide essentially the same surgical services. Armstrong's proposed ambulatory surgery center would needlessly duplicate existing facilities and health care services in Armstrong county.

Commonwealth Court Op. p. 5. At the very least four judges -- three Commonwealth judges and this judge -- read the Board opinion as indicating that the Department believed the Hospital ASC would be completed.

34

The presence or absence of a Hospital ASC was significant. A CON is granted if a proposed health care expenditure will meet medical needs of the target population in an effective and cost efficient manner. See Pa. Stat. Ann. tit. 35 S 448.707. There is no question that an ASC was more cost efficient than the continued use of the six hospital operating rooms. The Hospital's own accountant documented projected average cost savings of $400 per case if an ASC were used relative to the current Hospital operating rooms.

The issue before the Board was whether there would be overcapacity of ASCs if a CON were issued to Armstrong. Because the misrepresentations led the Board to believe there would be a Hospital ASC, it never reached the issue of delivering effective and cost efficient medical services under the scenario in which there was no Hospital ASC. There is simply no way for the District Court or this Court to determine whether the Board would have granted the CON had it known the true facts. With the Court having to accept all well-pleaded facts as true and resolve them in the light most favorable to the nonmovant, see Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc., 140 F.3d 478, 483 (3d Cir. 1998), the plaintiff is surely entitled to the reasonable inference that the Board predicated its decision, in major part, on the belief that a Hospital ASC would be completed. Therefore, I would hold the alleged misrepresentations deprive the Hospital parties of Noerr-Pennington immunity because their misrepresentations were material and infected the very essence or core of the administrative proceeding and consequent denial of the CON by the Board and affirmance of the Board's decision by the Commonwealth Court. Where as here, the misrepresentations caused the Board and Commonwealth Court to make their determinations based upon the existence of a fictional Hospital ASC, the administrative proceeding and Commonwealth Court review have been deprived of their legitimacy.

> 2. Noerr-Pennington Immunity Does Not Protect
> Threats of an Illegal Boycott

While an issue of first impression, the question of whether Noerr-Pennington petitioning immunity protects

35

threats of an illegal boycott must also be answered in the negative. The Supreme Court has stated, "[t]here are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations." California Motor Transp., 404 U.S. at 513. If the Supreme Court would not immunize misrepresentations in the judicial or administrative context, it surely would not immunize threats of illegal activity when they corrupt the administrative adjudication process. Where a threat of illegal activity plays such a strong role in the administrative decision-making process and forms part of the basis for an administrative decision, it is impossible to say that the process has not been corrupted. Denying Noerr-Pennington immunity to those who provide false information to the government in its deliberative decision-making process can only improve the information flowing to the government.

Attention is now turned to whether the Hospital parties are protected by state action immunity as urged by the majority.

III. Applicability of State Action Immunity

The majority opinion also dismisses Armstrong's complaint on the theory that the Hospital defendants' actions are immunized under the Parker state action immunity doctrine. See Parker v. Brown, 317 U.S. 341 (1943). The state action immunity doctrine has two related aspects. First, as elaborated in Parker, state action immunity protects parties who engage in otherwise actionable antitrust conduct, pursuant to, and in reliance upon, state action. Second, state action immunity applies when the antitrust injury complained of arises directly from state action, as distinguished from the private action alleged in the complaint before us. Noerr, 356 U.S. at 136. In this case, neither aspect of state action immunity is applicable.3

_____

3. The staff physicians defendants eschewed reliance upon Parker state action immunity, stating in the catch line of their argument, "Plaintiff's Attempt to Reframe this Appeal in Terms of State Action Immunity is

36

It is clear the actions complained of were not pursuant to, or in reliance upon, state action. Indeed, reliance upon the state action of denial of the CON to immunize unlawful anti-competitive conduct which occurred prior to and caused the denial of the CON presents severe conceptual difficulties. The only state action was denial of the CON. The Hospital parties engaged in no alleged unlawful anti-competitive behavior following the denial of the CON. Rather, the misrepresentations combined with the expressed intent to engage in a boycott all occurred before the Board's denial of the CON. With this state of affairs, it is difficult to understand how the misrepresentations coupled with the stated intent to boycott are somehow immunized by the CON, where the alleged wrongful activity itself was directed to and resulted in the denial of the CON. Furthermore, even assuming these conceptual difficulties are not insurmountable, there is no indication the Hospital parties relied upon the denial of the CON in carrying out the alleged unlawful anticompetitive behaviors, or were authorized by the state to do so. Indeed, the Parker court expressly noted that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U.S. at 351. Therefore, the "authorization" aspect of state action immunity is not applicable to the facts of this case.

The second aspect of state action immunity doctrine "immunizes" antitrust injuries directly caused by state action. It is this second aspect upon which the majority opinion rests, arguing that liability for injuries caused by

_____

Misguided. . . ." Individual Appellee's Br. at 20. Further, the Hospital dropped all reference to state action immunity on appeal. Appellee's counsel made a deliberate, reasoned choice not to rely on the theory, going so far as to state that "the correctness of the District Court's decision . . . is not accurately analyzed under state action immunity." Individual Appellee's Br. at 22. Thus, this is not a circumstance where a litigant's counsel overlooked a theory. While this Court is not limited by positions advanced by the litigants, caution is warranted where capable counsel expressly disavow reliance on a defense. The majority nonetheless has relied upon a state action defense explicitly and impliedly discarded by the defendants.

such state action is precluded even where it is alleged that a private party urging the action did do by unlawful conduct.

The defendants' actions are not protected by state action immunity for two reasons. First, at least some of the injuries of which Armstrong complains were not the direct result of the only state action alleged -- the denial of the CON. Second, a misrepresentation exception to state action immunity must apply under the circumstances presented by this case.

The majority finds the plaintiff failed to allege that its injuries were caused by the hospital parties' alleged economic boycott and misrepresentations. Rather, the majority asserts the alleged injuries were either directly related to the denial of the CON, or the consequences thereof. Even accepting arguendo that state action immunity applies to this case, some of the injuries alleged by Armstrong are not the direct result of state action, but of the alleged misrepresentations and conspiracy to boycott. After reciting throughout its complaint the boycott and misrepresentations, the Surgical Center lists the following damages:

> (1) Denial of the CON required to establish and op erate [its ambulatory surgery center].

> (2) Denial of [its] ability to establish and  operate [the proposed facility].

> (3) Delay in securing the required CON, if ultimat ely granted, for the establishment and operation of the [ambulatory surgery center].

> (4) Increased costs, legal and otherwise, in pursuing Plaintiff's application for a CON.

> (5) Complete loss of the value of the CON, or a reduction in its value when and if ultimately granted.

> (6) Complete loss of the value of Plaintiff's [facility], or reduction of its value when and if permitted to be operated.

> (7) Complete loss of, or reduction in, the income and cash flow which Plaintiff would have received from operation of the [center].

38

(8) Other related losses.

Because of the threatened boycott, damage claims 5, 6 and 7 would have occurred even if Armstrong had received the coveted CON. The boycott of plaintiff's surgical center by physicians who perform 90% of surgical procedures in the relevant geographic market surely would serve to reduce the value of the plaintiff's facility, either by the loss of business or the increase in costs associated with attracting personnel to the facility. An agreement to exclude the plaintiff from the relevant market by an economic boycott and misrepresentations to the Board may result in antitrust injury. See, e.g., Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 877 (3d Cir. 1995) (finding complaint adequately alleged antitrust injury where plaintiff alleged that defendants unreasonably restricted his ability to practice medicine in the relevant market and thus reduced competition). Therefore, I cannot agree with the majority's conclusion that damage claims 5, 6 and 7 stemmed from denial of the CON.

The misrepresentation exception to Noerr-Pennington immunity should also apply to state action immunity in the adjudicatory or administrative context. Where misrepresentations and/or threats of illegal activity subvert the entire decision making process, the direct cause of the injury is not the state action, but rather the misrepresentations or threats which made a decision based on accurate information impossible. See Woods Exploration & Producing Co., Inc. v. Aluminum Co. of Am., 438 F.2d 1286, 1295 (5th Cir. 1971), cert. denied, 404 U.S. 1047 (1972); see also Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 176 (1965) (holding that procurement of patent by fraud on the United States Patent Office is actionable under the Sherman Act, notwithstanding intervening state action of granting the patent).

In the legislative arena, it is difficult to say that any particular action, no matter how inappropriate, results in a particular legislation which causes injury. However, in the administrative and judicial arenas, where agencies and courts write reasoned opinions and make decisions based on information supplied by the parties, they must depend

39

on the parties to provide accurate information. 4 As stated above, the Supreme Court has noted different standards apply to conduct in administrative or adjudicatory processes. Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 500 (1988); California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 513 (1972); see supra, Part II.A. The misrepresentations here, at the very least, largely influenced and very probably dictated the outcome of the administrative process. Under that circumstance, it is the misrepresentations, not the state action, which caused the alleged injuries and dictated the Board's decision to deny the CON.5

Because Parker and Noerr are complementary expressions of one principle of antitrust law, a misrepresentation exception to Parker immunity is necessary to effectuate the misrepresentation exception to Noerr-Pennington immunity. Without an exception for those misrepresentations which have a pervasive influence on administrative and adjudicative decisions, only those defendants who most effectively subvert the state's process -- the ones whose improper behavior results in favorable results for them from the state's administrative and adjudicatory processes -- would be immune under state action immunity. This would not only be a perverse result,

_____

4. It is for this reason that reliance by the majority on Sandy River Nursing Care v. Aetna Casualty, 985 F.2d 1138, 1142 (1st Cir.), cert. denied, 510 U.S. 818 (1993), is misplaced. That case involved a decision by a legislature to change the law in the face of a boycott. It is impossible
to say that the boycott dictated the outcome of the legislature's decision.

5. The majority's reliance on Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n, 107 F.3d 1026 (3d Cir.), cert. denied, 118 S.Ct. 264 (1997), also is misplaced. There, an unaccredited law school alleged the American Bar Association engaged in anticompetitive conduct because graduates from unaccredited schools could not sit for most state bar examinations. This Court concluded the source of the injury was the action of each of those states because "every state retains the final authority to set all the bar admission rules." Id. at 1035. That case is distinguishable from the instant case for two reasons. First, the state action in that case was non-adjudicative in nature. Second, and more importantly, the plaintiff made no allegation that the ABA knowingly made misrepresentations which were central to each state's actions.

but would entirely vitiate the misrepresentation exception to Noerr-Pennington immunity.

This case is similar to Woods. In Woods, the defendants, partial owners of a natural gas field, intentionally gave false information about their production forecasts to the Texas Railroad Commission. 438 F.2d. at 1295. The Commission used that information to determine allowable production. Id. The court rejected "the facile conclusion that action by any public official automatically confers exemption." Id. at 1294 (citations omitted). The court held that state action immunity was not applicable because the misrepresentations dictated the outcome: "defendants' conduct here can in no way be said to have become merged with the action of the state since the Commission neither was the real decision maker nor would have intended its order to be based on false facts." Id. at 1295. Thus, the injury was not directly caused by state action, but by the misrepresentations. Similarly in the instant case, the Board relied on the Hospital parties' statements of subjective intent in making its decision.

The majority believes that Woods is distinguishable from the present case because the Texas Railroad Commission "was wholly dependent on the antitrust defendants for the factual information on which it predicated its allocation of production from a given field." [Majority opinion at 18 n.8]. The court in Woods stated that the Railroad Commission had "no opportunity for meaningful supervision or verification" of the defendants' statements and therefore, the Commission "must rely on the truthfulness of the gas producers." Id. at 1295. I do not find Woods to be so different from this case. Here, the Department and Board had no way of ascertaining whether the Hospital truly intended to complete its ASC. The Department and the Board were reasonable in relying on the defendants' statements, which clearly implied that the Hospital ASC would be completed and utilized. Further, the court in Woods did not require that the government entity be "wholly" dependent on the information provided by a defendant in order to deny state action immunity.

41

CONCLUSION

For the reasons stated above I would hold state action immunity does not protect the defendants' actions. I also conclude there is a misrepresentation exception to Noerr–Pennington immunity and that it applies in this case. My view that material misrepresentations can vitiate Noerr–Pennington immunity is supported by Cheminor, 168 F.3d at 124, and the case law of other circuits, specifically the Fifth, Woods Exploration & Producing Co., Inc. v. Aluminum Co. of America, 438 F.2d 1286, 1298 (5th Cir. 1971), Sixth, Potters Medical Center v. City Hospital Ass'n, 800 F.2d 568, 580 (6th Cir. 1986), Ninth, Kottle v. Northwest Kidney Centers, 146 F.3d 1056, 1060 (9th Cir. 1998), cert. denied, 119 S.Ct. 1031 (1999), Eleventh, St. Joseph's Hospital v. Hospital Corp. of America, 795 F.2d 948, 955 (11th Cir. 1986), and District of Columbia, Whelan v. Abell , 48 F.3d 1247, 1254–55 (D.C. Cir. 1995). See also Cheminor, 168 F.3d at 131 (Sloviter, J., dissenting) (citing Whelan and Kottle for the proposition that PRE preserves a fraud exception to antitrust immunity).

The misrepresentations were material as there is an overpowering inference that in denying the CON the Board accepted the Hospital parties' misrepresentation that the Hospital would complete construction and operate a Hospital ASC. These same misrepresentations caused the Board and Commonwealth Court to pass upon the question of whether there was a need for two ASCs. Specifically, the misrepresentations deprived the Board from passing upon the CON application based upon the true facts -- six hospital rooms vis-a-vis the grant of Armstrong's application for a CON, with concomitant cost savings of $400 per case, thereby meeting the statutory goal of meeting medical needs in an effective and cost efficient manner. We do not know, of course, whether the Board would have granted or denied the CON application had its proceeding not been so pervasively infected by the misrepresentations and threat of boycott.

I respectfully and regrettably dissent for all of the reasons set forth above. While respecting my colleagues differing views, I cannot agree with them. I regret the majority result for two reasons. First, the majority opinion, in light of

42

Cheminor, has provided little, if any, guidance to the bar, future litigants or the public. Second, to the extent the majority result provides guidance, it signals that it is willing to immunize clear antitrust violations if they can be disguised, however disingenuously, as petitioning activities without regard to whether they are legitimate, and without distinguishing the arena in which they are made.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

43